1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

### EASTERN DISTRICT OF CALIFORNIA

10

11  FRED MCMILLEN,

12           Plaintiff,

13       v.

14  COMMISSIONER OF SOCIAL SECURITY,

15           Defendant.

16
17
18

Case No.  1:22-cv-00925-SAB

ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL

(ECF Nos. 15, 18, 23)

19                    **I.**

20              **INTRODUCTION**

21       Plaintiff Fred McMillen ("Plaintiff") seeks judicial review of a final decision of the

22  Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for

23  Social Security benefits pursuant to Title II of the Social Security Act.  The matter is currently

24  before the Court on the parties' briefs, which were submitted without oral argument, to

25  Magistrate Judge Stanley A. Boone.[1]  For the reasons set forth below, Plaintiff's appeal shall be

26  denied.

27  _____

28  [1]  The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been
assigned to Magistrate Judge Stanley A. Boone for all purposes.  (ECF Nos. 10, 12, 24.)

## II.

## BACKGROUND[2]

### A.     Procedural Background

This is an appeal of a Social Security decision issued subsequent to remand of Plaintiff's appeal of a prior decision by the Commissioner.

Plaintiff filed his original application for Social Security benefits under Title II on October 31, 2012, alleging disability beginning June 1, 2011.  (See Admin. Rec. ("AR") 158–60, ECF Nos. 14-1, 14-2.)  Plaintiff's claims were initially denied on June 13, 2013, and denied upon reconsideration on March 10, 2014.  (AR 101–06, 107–12.)  On October 15, 2015, Plaintiff, represented by counsel,[3] appeared for an administrative hearing before Administrative Law Judge Vincent Misenti in Fresno, California.  (AR 41–74.)  Vocational expert ("VE") Cheryl R. Chandler, also testified at the hearing.  With leave from Judge Misenti, Plaintiff submitted additional medical records subsequent to the hearing, which were also considered before Judge Misenti issued his decision.  (See AR 21 (citing AR 226–27 (Ex. 16E), 504–904 (Exs. 11F–20F)).)  On January 25, 2016, Judge Misenti issued a decision denying benefits.  (AR 18–37.)  On March 9, 2017, the Appeals Council denied Plaintiff's request for review, making the Judge Misenti's decision the final decision of the Commissioner.  (AR 1–6.)

Plaintiff challenged this decision in federal court on May 13, 2017, seeking judicial review of the Commissioner's decision under 42 U.S.C. 405(g).  (AR 1065–71; see McMillen v. Berryhill (McMillen I), No. 1:17-cv-00664-SKO, Dkt. 1 (E.D. Cal. May 13, 2017).  On appeal, Plaintiff challenged the original ALJ's decision as to his evaluation of Dr. Stacey's medical opinion, the opinion of NP Practitioner ("NP") Rico, and Plaintiff's subjective complaints, and Plaintiff argued the RFC determination did not adequately reflect the opinion of Dr. Damania.  McMillen I, Dkt. 17 (E.D. Cal. Feb. 28, 2018).  On August 7, 2018, the district court reversed the

---

[2] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.  However, the Court will refer to the parties' briefings by their ECF pagination.

[3] Plaintiff was represented by non-attorney representative Mario A. Davila at the first hearing, and by Mr. Davila and Stephen Tow at the administrative level prior to Plaintiff's first appeal.  (See AR 21, 148, 155.)  Plaintiff was later represented by Jacqueline Anna Forslund, of Forslund Law LLC, on appeal in federal court.  See McMillen I.

decision of the Commissioner and remanded the case for further administrative proceedings.  (AR 1072–1111); McMillen I, 2018 WL 3769829 (E.D. Cal. Aug. 7, 2018) (Dkt. 28).   More specifically, the district court found that Judge Misenti's evaluation of the opinions of Dr. Stacey and NP Rico was appropriate, id. at *10–14, and the ALJ's discounting of Plaintiff's subjective testimony was well-supported, id. at *15–20.   However, the district court found Judge Misenti erroneously disregarded portions of Dr. Damania's opinion by failing to consider all of the limitations imposed by Dr. Damania, even after according "significant weight" to the opinion.  Id. at *12.   Because Dr. Damania's opinion was inconsistent with the ultimate finding of nondisability, the district court determined the error was harmful and remand was warranted.  Id. at *13.

On September 14, 2018, in accordance with the district court's ruling, the Appeals Council vacated Judge Misenti's decision and remanded the case to a new administrative law judge for further proceedings.  (AR 1114.)  Specifically, the Appeals Council directed the new administrative law judge to "consider the medical evidence as a whole, and either properly credit Dr. Damania's opinion, or provide specific and legitimate reasons, supported by substantial evidence, for rejecting Dr. Damania's opinion.  The ALJ shall then assess Plaintiff's RFC and proceed through Steps Four and Five to determine what work if any, Plaintiff is capable of performing."  (AR 973 (citing AR 1110).)

On September 26, 2019, Administrative Law Judge Shiva Bozarth (the "ALJ") held a second hearing, in Fresno, California.  (AR 992–1026.)  Plaintiff appeared, represented by new counsel.[4]  Plaintiff submitted additional medical records prior to the hearing, which the ALJ admitted into evidence and considered when rendering her decision.  (See AR 973–74.)  Medical Expert Kweli J. Amusa testified at the hearing.  VE Cheryl R. Chandler again testified at the hearing.  On January 2, 2020, the ALJ issued a new decision denying benefits.  (AR 970–91.)  On May 26, 2022, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (AR 957–62.)

---

[4] Plaintiff was represented by Sengthiene Bosavanh at the hearing, and by attorney Jeffrey L. Milam, of Milam Law, at the administrative level, post-remand.  (See AR 973, 1167.)  Plaintiff is currently represented by attorney Francesco Paulo Benavides, of the Law Offices of Francesco Benavides.  (See ECF No. 15 at 1.)

Plaintiff initiated the instant action in federal court on July 26, 2022, once again seeking judicial review of the denial of his application for benefits.  (ECF No. 1.)  The Commissioner lodged the administrative record on November 8, 2022.  (ECF No. 14.)  On December 23, 2022, Plaintiff filed a motion for summary judgment appealing the Commissioner's decision.  (ECF No. 15.)  On March 9, 2023, Defendant filed a cross-motion in opposition to Plaintiff's motion.  (ECF No. 18.)  On March 22, 2023, Plaintiff field a reply brief (ECF No. 23), and the matter is now deemed submitted on the pleadings.

### B.    Relevant Medical Evidence

#### 1.    Mountain Diagnostics

On May 9, 2005, Plaintiff had a magnetic resonance imaging ("MRI") scan performed of his thoracic spine at Mountain Diagnostics in Las Vegas, Nevada.  (AR 888.)  The results were compared to an MRI of Plaintiff's thoracic spine from November 2003 and revealed "slight dorsal spinal cord displacement at T7–8 and intermittent mild spinal cord encroachment[.]"  (Id.)

#### 2.    Michelle Stacey, M.D.

On June 3, 2010, Plaintiff presented to Dr. Stacey to follow up on previous lab tests and refill his medication.  (AR 362.)  Dr. Stacey's physical examination of Plaintiff was unremarkable except for mild tenderness upon palpation in the lumbar spine and decreased deep tendon reflex at the knee on the right side.  (AR 363.)  Dr. Stacey ordered an MRI of Plaintiff's thoracic and lumbar spine and opined that Plaintiff would benefit from pain management and a surgery evaluation.  (AR 364.)  Dr. Stacey also ordered an ultrasound of Plaintiff's thyroid following complaints of pain and swelling on the right side of his neck.  (AR 362, 364.)

On July 1, 2010, Plaintiff told Dr. Stacey his back was bothering him more than usual and he had increasing pain that radiated down his right leg.  (AR 357.)  When Plaintiff returned to Dr. Stacey on July 30, 2010 to review the results of his MRI, Plaintiff complained of neck problems and continued back pain.  (AR 350–51.)  The MRI of Plaintiff's thoracic spine revealed mild degenerative disc disease, a prominent posterior disc bulge at T8–T9 without spinal stenosis or neural impingement, and no acute or subacute compression fractures.  (AR 355.)  The MRI of Plaintiff's lumbar spine revealed a moderate central disc bulge at L4–L5 with moderate

narrowing of the lateral recess, minimal degenerative disc disease of L5–S1, an annular tear with a mild to moderate diffuse central disc bulge, and minor narrowing of the left compared with the right lateral recess.  (AR 353.)

On August 27, 2010, Dr. Stacey received the results of the ultrasound on Plaintiff's thyroid, which revealed several thyroid nodules, particularly on the right side.  (AR 345, 349.) Plaintiff continued to experience pain and swelling in his neck so his back surgery consultation was put on hold until after his thyroid surgery.  (AR 322, 324, 326.)  On November 29, 2010, Plaintiff underwent a total thyroidectomy.  (AR 335–36.)  Plaintiff's surgeon wrote a letter to Dr. Stacey stating that Plaintiff "did great" with the surgery and his pathology was benign.  (AR 333.)

On January 20, 2011, Plaintiff continued to complain of back pain, but his back surgery consultation was delayed because he failed to provide the court in his workers' compensation case with his medical records in a timely manner.  (AR 313.)  Dr. Stacey noted Plaintiff had radiculopathy symptoms in his legs, but was in no acute distress.  (AR 314.)  Plaintiff reported that taking oxycodone instead of Percocet and Lortab was "working out well for his stomach," but he would like to increase the dosage to adequately control his pain.  (Id.)

On February 17, 2011, Plaintiff reported that he initially felt okay after his thyroidectomy, but he was experiencing pain at the incision site, which worsened when he laid down.  (AR 310–11.)  Plaintiff also complained of continued back pain that radiated down to his leg. (AR 311.) Plaintiff's symptoms continued at his appointment on March 17, 2011, but he reported his pain was "fairly well controlled with his medication."  (AR 307.)  Dr. Stacey noted that Plaintiff had a surgery consultation pending, but was still waiting for his workers' compensation case to be processed.  (Id.)  Dr. Stacey started Plaintiff on Neurontin for his neuropathy.  (AR 308.)

On April 14, 2011, Plaintiff reported the Neurontin worked "really well" at controlling his neck pain, which was almost completely resolved.  (AR 304.)  Dr. Stacey noted Plaintiff's condition was stable and Plaintiff had a hearing coming up in June in his workers' compensation case, which Dr. Stacey hoped would allow Plaintiff's back surgery to move forward.  (Id.) Plaintiff reported he had gone back to work, which had exacerbated his pain, but he did not want to change his pain medication.  (Id.)  Plaintiff continued to have pain in his lower back and legs at

his appointment on May 11, 2011.  (AR 296.)

In a letter dated August 14, 2012, Dr. Stacey wrote that Plaintiff suffered from multiple medical issues including degenerative disc disease confirmed by MRI, hypothyroidism status post thyroidectomy, nephrolithiasis, gout, and hypertension.  (AR 604.)  Dr. Stacey stated that Plaintiff remained symptomatic with numbness and tingling in his bilateral lower extremities and chronic neck and back pain, despite medical therapy.  (Id.)  Dr. Stacey also stated Plaintiff "need[ed] further evaluation by pain management, orthopedic surgery, and further testing (potentially neurologic evaluation)."  (Id.)  Finally, Dr. Stacey opined that Plaintiff had been unable to work because of his chronic back problems and side effects of his opioid medications. (Id.)

3.      Physician's Assistant David Armitage

On December 22, 2010, Plaintiff presented to Dr. Stacey's physician's assistant, PA Armitage, to follow up on the results of his thyroidectomy performed during the previous month. (AR 317.)  Plaintiff reported his pain medication was no longer as effective as it used to be and his blood pressure increased whenever he took the medication.  (Id.)  Upon examination, PA Armitage found Plaintiff to be alert, oriented, and in no acute distress.  (AR 317–18.)

On June 8, 2011, PA Armitage noted that when Plaintiff walked, "he held his back really straight" and he would use his arm to push himself up when he stood up out of a chair.  (AR 293.) PA Armitage recommended Plaintiff continue wearing his back brace and increased his Neurontin prescription.  (AR 294.)  On July 5, 2011, Plaintiff reported that his back was "just killing him" and he felt like he had "a knife stuck between his shoulder blades all the time."  (AR 285.)  The oxycodone helped alleviate Plaintiff's pain, but its effectiveness wore off quickly. (Id.)  Plaintiff further reported that his hands were going numb and he was losing fine motor coordination in his left hand.  (Id.)  Plaintiff also stated his workers' compensation case was "dragging on and on" so he would look into private insurance because his back pain was getting worse and he wanted the surgery to fix it.  (Id.)  Upon examination, PA Armitage noted Plaintiff had +4 strength in all muscle groups of his upper extremities and a marked tremor against resistance or exertion of his left upper extremity, as well as neuropathy and radiculopathy of the

upper and lower extremities.  (AR 286.)  PA Armitage also noted that Plaintiff had good fine and gross motor control; was able to sit, stand, and walk without difficulty; and had a normal gait. (Id.)  PA Armitage prescribed Contin and recommended Plaintiff cut back on oxycodone.  (AR 286–87.)  PA Armitage also ordered another MRI of Plaintiff's thoracic and lumbar spine.  (AR 287.)

On August 30, 2011, Plaintiff reported that his medications were "really, really helping" and he was doing "much, much better."  (AR 274.)  PA Armitage reviewed the results of Plaintiff's MRI with him.  (Id.)  According to the doctor that interpreted the images, the MRI of Plaintiff's thoracic spine was normal, but the MRI of the lumbar spine revealed desiccation of L4–L5 and L5–S1; right paracentral/neuroforaminal disc protrusion associated with an annular tear at L4–L5; questionable contact with the exiting right nerve root; and a mild, broad-based disc bulge at L5–S1 with no significant associate stenosis.  (AR 274, 288–89.)  PA Armitage provided a referral to orthopedic spine surgeon Dr. William Smith, M.D.  (AR 275.)

On September 27, 2011, Plaintiff reported to PA Armitage that he was doing "pretty good," but that his back pain was getting worse.  (AR 271.)  Plaintiff was also doing "really good" on November 28, 2011, even though he recently returned from a vacation where he was not able to refill his prescription and had to drastically cut down on the medication to make it last. (AR 265.)  On December 27, 2011, Plaintiff again reported he was doing "pretty good," but that his back and legs still hurt.  (AR 260.)  On March 22, 2012, Plaintiff stated he was having financial trouble and may need to cut back on his medication, but was going to Virginia for a couple months to visit family and would also visit the Spinal Institute to see if a doctor there could offer any assistance for his back pain.  (AR 249.)

4.     William Smith, M.D.

On October 3, 2011, Plaintiff presented to Dr. Smith, an orthopedic surgeon, with complaints of increasing back pain for the previous seven years.  (AR 239.)  Dr. Smith noted Plaintiff had percussion tenderness of this mid-thoracic and lower lumbar spine with flexion and extension that was 80% of normal and "quite painful."  (AR 241.)  Dr. Smith further noted that Plaintiff had right sciatic tenderness as well as diminished sensation in the left and right L5

dermatomes.  (Id.)  Deep tendon reflexes were normal, active, and symmetrical, and Plaintiff walked with an antalgic gait.  (Id.)  Dr. Smith opined that although Plaintiff's thoracic spine MRI was read as normal, there was a loss of discal height at T8 and T7.  (AR 242.)  Dr. Smith ordered a CT scan of Plaintiff's thoracic spine and x-rays of his lumbar spine, and referred him to pain management for epidural steroid injections.  (Id.)  Dr. Smith instructed Plaintiff to return after these studies were done.  (Id.)

The CT scan of Plaintiff's thoracic spine revealed mild degenerative changes, but no significant canal narrowing, only mild canal narrowing at T7–T8, and mild to moderate foraminal narrowing at the T9–T10 level.  (AR 255.)  Plaintiff reported to PA Armitage that he attempted several times to make a subsequent appointment with Dr. Smith, but he was unable to get through and Dr. Smith sent him a "massive bill" that he was trying to work out.  (AR 257, 260.)

### 5.    Saint Agnes Medical Center

On April 23, 2013, Plaintiff presented to the Saint Agnes Medical Center emergency room complaining of neck and shoulder pain.  (AR 428.)  Plaintiff rated his pain as an eight on a scale of one to ten.  (AR 432.)  The doctor noted Plaintiff was alert, in no acute distress, and had normal range of motion and normal strength with no swelling or deformities.  (AR 429.)  Plaintiff's diagnosis was radicular right arm pain.  (Id.)  Plaintiff was instructed to take ibuprofen for his pain and follow up with his doctor if the pain did not go away.  (AR 437.)

### 6.    Rustom F. Damania, M.D.

On May 16, 2013, Dr. Damania performed an internal medicine evaluation of Plaintiff at the request of state agency.  (AR 414–19.)  Plaintiff reported he experienced continuous lower back pain since 2003 when he suffered an injury at work.  (AR 414.)  According to Plaintiff, the pain radiated to his left leg and was associated with paresthesia, numbness, and weakness.  (Id.)  The pain in his thoracic spine radiated to both shoulders, upper back, and into both arms with paresthesia.  (Id.)  Plaintiff stated he had used a cane since 2011 because he was unable to stand up from a seated position due to pain and weakness in his left leg.  (Id.)  Plaintiff also stated he did not have workers' compensation or medical insurance and had not been to a doctor for a follow up appointment since May 2012.  (Id.)

Upon physical examination, Dr. Damania observed Plaintiff's neck and upper and lower extremities to have full range of motion within normal limits.  (AR 416–17.)  Dr. Damania's examination also revealed tenderness at the T7–T8 level, but no signs of radiculopathy in the upper extremities; positive straight leg raise test on the left at 45 degrees in the sitting position; and reduced forward flexion, extension, and lateral flexion in Plaintiff's back.  (Id.)  Plaintiff's muscle strength in the right lower extremity was 5/5 and 4/5 in the left lower extremity with no obvious wasting.  (AR 418.)  Plaintiff had sensory impairment in the L4–L5 distribution of the left lower leg and normal deep tendon reflexes.  (Id.)

7.      Nurse Practitioner Helen Monnens

On November 5, 2013, NP Helen Monnens ordered x-rays of Plaintiff's cervical spine and thoracic spine because Plaintiff reported experiencing pain in his bilateral mandibles and numbness in his hands.  (AR 448, 461.)  The x-rays of Plaintiff's cervical spine revealed mild degenerative changes of the cervical spine with neural foraminal narrowing and straightening of the normal cervical lordosis that might have been due to Plaintiff's positioning and/or muscle spasm.  (AR 449, 459.)  The x-rays of the thoracic spine revealed mild degenerative changes and a suggestion of diffuse osseus demineralization.  (AR 450, 460.)

MRIs of Plaintiff's cervical spine and thoracic spine were also performed on December 11, 2013.  (AR 452–58.)  The MRI of Plaintiff's cervical spine revealed degenerative changes in the cervical spine; mild reversal of the normal cervical lordosis at C4–C5; a two-millimeter left paracentral disc osteophyte complex at C4–C5, which mildly indented the left ventral surface of the spinal cord; a two-millimeter central protrusion with associated annular fissuring at the C5– C6 level, which caused a mild impression on the ventral surface of the spinal cord; and a one- millimeter central protrusion with associated annular fissuring, which indented the thecal sac at the C6–C7 level.  (AR 453.)  The MRI of Plaintiff's thoracic spine revealed mild chronic wedging of the T6 vertebral body with approximately 15% loss of height, with the rest of the rest of the heights preserved; a normal thoracic spinal cord; and a small central protrusion with associated annular fissuring, which indented the thecal sac, but did not contact the spinal cord. (AR 455–56.)  No spinal canal stenosis, neural foraminal narrowing, or abnormal signal in the

ligaments or paraspinal muscles, were noted.  (Id.)

NP Monnens's treatment notes from December 19, 2013, state she was referring Plaintiff to a neurosurgeon.  (AR 457.)

8.    Nurse Practitioner Pamela Rico, FNP/ Dr. Kathleen Baron, M.D.

On February 13, 2014, Plaintiff presented to NP Rico at Primary Care Consultants to establish care.  (AR 613.)  According to Plaintiff, he established care at Primary Care Consultants because his previous provider "dropped the ball" and he was waiting for a referral to a neurosurgeon that was never provided.  (Id.)  Plaintiff reported he had "weaned himself off all meds," but did have a bottle of Norco from his previous provider that he was trying to stretch as long as possible.  (Id.)  Plaintiff also reported he was angry that he was not getting the disability benefits to which he felt entitled and had not attended physical therapy recently because he could not afford to travel to Oakhurst one to two times a week.  (Id.)

Plaintiff complained of muscle cramps, joint pain, back pain, muscle weakness, and loss of strength.  (AR 617.)  On physical examination, NP Rico observed Plaintiff to be in no acute distress and have normal, full range of motion in all joints, with weakness to upper extremity grips.  (Id.)  NP Rico noted Plaintiff had a steady gait and changed position with ease, but had spasms in his cervical spine and upper shoulder area.  (Id.)  NP Rico prescribed Norco and Synthroid, ordered several additional tests, and referred Plaintiff for a physical therapy consultation.  (AR 620.)  Plaintiff's treatment notes from his February 13, 2014 appointment were electronically signed by both NP Rico and Dr. Kathleen Baron, M.D.  (AR 621.)

Plaintiff returned to NP Rico on March 4, 2014, to follow up on his test results.  (AR 642.)  NP Rico reviewed Plaintiff's previous MRIs and explained to Plaintiff that his MRI results were not severe enough to warrant surgery at that time.  (Id.)  NP Rico encouraged Plaintiff to participate in physical therapy because if he did not show improvement, it would help show the neurologist that he had tried everything before surgery.  (Id.)  Plaintiff refused to try physical therapy because he said he could not afford to travel to Oakhurst twice a week; however, NP Rico reminded Plaintiff of a service that would provide free transportation to his appointments.  (Id.)

NP Rico's treatment notes, co-signed by Dr. Baron, for Plaintiff's appointments on April

10, May 2, May 28, July 1, July 22, and September 12, 2014, indicate his condition generally remained unchanged.  (AR 657, 663, 673–74, 680, 686, 854.)  Specifically, Plaintiff continued to be in no acute distress, walk with a steady gait, change positions with ease, and have normal range of motion in his extremities with weakness in his upper extremity grips and spasms in his cervical spine and upper shoulder area.  (AR 656, 662, 672–73, 679, 685, 853.)

An MRI of Plaintiff's lumbar spine was performed on August 13, 2014.  (AR 840.)  The MRI revealed degenerative changes in the lumbar spine, a three-millimeter central protrusion with associated annular fissuring at the L5–S1 level, and a two-millimeter right paracentral protrusion with associated annular fissuring at the L4–L5 level.  (Id.)  Plaintiff also had MRIs taken of his cervical spine and thoracic spine on September 4, 2014.  (AR 844–49.) The MRI of the cervical spine revealed unchanged findings from the earlier MRI on December 11, 2013.  (AR 844.)  The MRI of the thoracic spine revealed degenerative changes similar to the MRI in December 2013, as well as fissuring of the posterior portion of the annulus at the T5–T6 level and a one-millimeter central protrusion with associated annular fissuring at the T7–T8 level.  (AR 848.)  The reviewing doctor also noted mild chronic anterior wedging of the T6 vertebral body, with approximately 15% loss of height, which was unchanged compared to the prior MRI in December 2013.  (Id.)

On September 14, 2014, NP Rico completed a Disability Impairment Questionnaire for Plaintiff.  (AR 499–503.)  NP Rico diagnosed Plaintiff with neck pain, thoracic pain, lumbar back pain, herniated discs (cervical and lumbar), and nerve root and plexus disorder.  (AR 499.)  As support for her diagnosis, NP Rico generally cited "multiple images" without specifying any particular images and stated Plaintiff had "seen specialists" and had a pending surgery.  (Id.)  NP Rico opined that Plaintiff could perform a job in a seated position for less than one hour in an eight-hour workday and needed to get up from a seated position every thirty minutes for five to ten minutes.  (AR 501.)  NP Rico also opined that Plaintiff could perform a job in a standing and/or walking position for less than one hour in an eight-hour day, and had significant limitations in reaching, handling, or fingering.  (AR 501–02.)  According to NP Rico, Plaintiff could occasionally lift and carry up to ten pounds, but could never lift or carry more than ten

pounds.  (AR 501.)  NP Rico concluded Plaintiff would need several unscheduled breaks of ten to fifteen minutes, and on average, would likely be absent more than three times per month due to his impairments.  (AR 502–03.)  NP Rico opined Plaintiff's limitations and symptoms applied as far back as March 1, 2010.[5]  (AR 503.)

On May 25, 2016, NP Rico and Dr. Baron completed an updated letter, asserting that Plaintiff would be limited to sitting for less than one hour and standing and/or walking for less than one hour in an eight-hour day; could only occasionally lift and carry up to ten pounds; would need to get up and move around every 30 minutes for five to ten minutes; and his symptoms would likely increase if he were placed in a competitive work environment.  (AR 956.)

       9.    William J. Jawien, M.D.

On April 4, 2014, Plaintiff saw Dr. Jawien for a hematology/oncology consultation.  (AR 473.)  Dr. Jawien's examination of Plaintiff's back and spine revealed no kyphosis, scoliosis, compression fractures, or tenderness.  (AR 474.)  Plaintiff had a normal gait and normal range of motion with no obvious weakness.   (AR 474–75.)   Dr. Jawien assessed Plaintiff with leukocytosis,  chronic neck and back pain, and questionable hepatomegaly with increased hepatic echogenicity.  (AR 475.)  On May 6, 2014, Plaintiff returned to Dr. Jawien for a follow up appointment and Plaintiff's physical examination remained unremarkable.  (AR 478.)

       10.    Rohini J. Joshi, M.D.

On April 30, 2014, Plaintiff presented to neurologist Dr. Joshi complaining of numbness and tingling in his limbs and ringing in his ears.  (AR 468.)  Upon physical examination, Dr. Joshi found Plaintiff to have normal muscle tone and strength in his upper and lower extremities, with normal bilateral sensation and reflexes.  (AR 469–70.)  Dr. Joshi noted Plaintiff's coordination and gait were normal.  (AR 470.)  Dr. Joshi diagnosed Plaintiff with cervical spondylosis and referred Plaintiff for pain management and neurological surgery.  (Id.)  Dr. Joshi ordered a neurologic evaluation of Plaintiff, which was performed by Dr. Boota Cahil, M.D. on July 28, 2014.  (AR 472.)  Dr. Cahil found that motor and sensory nerve conduction studies of the right

---

[5] According to Plaintiff, both NP Rico and Dr. Baron signed the opinion, but the purported signature of Dr. Baron is illegible.  (AR 70, 503; see also Doc. 17 at 24.)

and left median and ulnar nerves were normal.  (Id.)  There was no evidence of compression neuropathy, polyneuropathy, or ongoing cervical radiculopathy.  (Id.)

Dr. Joshi's examination on August 21, 2014 yielded similar findings to Plaintiff's April appointment.  (AR 466–67.)  On October 1, 2014, Dr. Joshi noted Plaintiff had restricted range of motion of the proximal upper extremity with positional pain in the neck.  (AR 462.)  Dr. Joshi's examination of Plaintiff yielded otherwise unremarkable results with Plaintiff showing normal muscle tone and strength, reflex, coordination, and gait.  (AR 464.)

11.    State Agency Physicians

On June 10, 2013, W. Jackson, M.D., a Disability Determination Services medical consultant, reviewed the medical evidence of record and concluded Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk four hours in an eight-hour day with normal breaks; sit six hours in an eight-hour day with normal breaks; and perform postural activities occasionally.  (AR 81–82.)  Dr. Jackson identified no manipulative, visual, communicative, or environmental limitations.  (AR 82.)  Upon reconsideration, on March 8, 2014, another Disability Determination Services medical consultant, Lisa Mani, M.D., performed an independent review of Plaintiff's medical records and affirmed Dr. Jackson's opinion.  (AR 94–95.)

12.    Nurse Practitioner James Tram FNP-BC/ Dr. Ripul Panchal, DO

On August 12, 2015, imaging of the c-spine revealed straightening of the spine, C4/5 with left paracentral disc bulge, C5/6 central disc bulge, and C6/7 broad disc bulge.  It was noted there were no symptoms changes from the previous study from September 4, 2014.  (AR 920.)  Physical examination revealed intact cranial nerves, no pronator drift, steady gait with some difficulty walking heel and toe, and negative Hoffman's test.  (AR 922.)  Plaintiff demonstrated a full range of motion of the cervical spine.  NP Tram developed a care plan with Plaintiff, which was later signed off on by Dr. Panchal, that included a recommendation for C-spine surgery.  (AR 918–21.)

Progress notes indicate Plaintiff proceeded with "elective neurological surgery"—anterior cervical discectomy and fusion surgery on his cervical spine at C4/5, C5/6, and C6/7—on

1    October 22, 2015.  (AR 914–18; see also AR 933–36.)

2          On November 18, 2015, Plaintiff reported neck and upper extremity pain at a 10/10, but it

3    was advised he take some more time to for post-operative improvement.  (AR 912–13.)

4          13.    Medical Expert Dr. Kweli Amusa

5          Medical Expert, Dr. Amusa, testified at the September 26, 2019 hearing.  Dr. Amusa

6    reviewed all of Plaintiff's records, through Exhibit 25F (AR 1280–93 (records through April 20,

7    2016)), though the ALJ noted the period of particular relevance was between June 1, 2011 (the

8    date of alleged disability onset) and March 31, 2014 (the date last insured).  (AR 1000–01.)  Dr.

9    Amusa noted Plaintiff's chronic pain related to the spine at the cervical, thoracic, and lumbar

10   levels and that multiple images—including images from 2010, 2011, 2013, and later, beyond the

11   relevant period—show varying degrees of degenerative changes at each level.  (AR 1001.)  Dr.

12   Amusa opined Plaintiff's severe impairments included degenerative disc disease.  Dr. Amusa

13   noted Plaintiff had thyroid cancer in 2011, which required surgery and treatment, but that this

14   condition did not last 12 months (as required by the Regulations), and was resolved after surgery.

15   (AR 1001–02.)  Dr. Amusa opined Plaintiff's hypertension was non-severe, as there was no

16   evidence in the records of any organ damage.  (AR 1002.)  While Plaintiff's degenerative changes

17   to the spine were deemed severe, Dr. Amusa determined they did not meet or equal Listing 1.04

18   (disorders of the spine), because the medical record does not contain evidence of abnormalities

19   required under the Listing.  (Id.)  Dr. Amusa opined Plaintiff would be limited to work at the

20   sedentary level.  (Id.)  However, Dr. Amusa noted that, towards the end of the relevant period,

21   from 2013–2014, pain management and primary care records indicate the neck and upper

22   extremities were more problematic, despite continuing complaints of pain in the lower and mid-

23   back.  (AR 1002–03.)  On these records—especially the imaging, neurologic evaluation, and

24   nerve conduction studies at Exhibits 4F, 5F, 6F, 7F, and 8F (AR 411–72), as well as Plaintiff's

25   reports of pain and findings of some weakness in the extremities—Dr. Amusa opined Plaintiff

26   could stand and walk two hours in an eight-hour day, and sit for six hours in an eight-hour day.

27   (AR 1003–04, 1007.)  Dr. Amusa opined Plaintiff could never climb ladders, ropes, or scaffolds;

28   only occasionally reach overhead; only frequently reach in all other directions; only frequently

14

handle and finger (bilaterally); only occasionally operate foot controls; must avoid any unprotected heights or dangerous machinery; and could tolerate only occasional exposure to any uneven terrain. (AR 1003.) Based on review of Plaintiff's medical records subsequent to the relevant disability period, Dr. Amusa opined Plaintiff's condition has not improved in any way since March 31, 2014. (Id.)

With respect to Dr. Damania's opinion that Plaintiff was limited to sitting for two to four hours out of an eight-hour day (AR 419), Dr. Amusa testified that such a limitation was not warranted by the record. (AR 1006–07.) Specifically, Dr. Amusa noted Plaintiff did not require an assistive device, and nothing in the examinations, and nothing documented in Dr. Damania's report supported that sitting limitation. (AR 1007.)

On cross-examination by Plaintiff's attorney, Dr. Amusa also opined Plaintiff would require some absence from work for doctor's visits. More specifically, Dr. Amusa noted the records only indicated one visit in April 2013 (the emergency visit) which would have fallen outside of the routine office visit; therefore, Dr. Amusa testified the evidence did not support an average of two absences per month. When asked on cross-examination, Dr. Amusa testified that Plaintiff's absences may possibly average out to one absence per month, but "I did not count." (AR 1004–05.) Dr. Amusa testified that Plaintiff likely would not require an overhead reaching limitation more limiting than "occasional," nor would Plaintiff require more than a "frequent" limitation for the other functions because there was no evidence of radiculopathy based on the objective testing of the nerves. (AR 1004–06.)

## C.    Relevant Non-Medical Evidence

### 1.    Plaintiff's Symptom Testimony

In applying for benefits, Plaintiff alleged disability due to hypothyroidism, lumbar and thoracic spine impairment, herniated disc, and severe back pain. (AR 176, 191–92)

At the October 15, 2015 hearing, Plaintiff testified that he suffers from disabling neck and back pain, but his neck is the more significant issue. (AR 48.) Plaintiff testified that his neck pain began around January 2013 and caused him to lose control of his fine motor skills. (Id.) According to Plaintiff, he experiences a burning sensation that radiates from his jaw, down to his

shoulders, arms, hands, chest, and rib area and a stabbing sensation in his jaw after he eats.  (AR 48–49.)  Plaintiff takes several medications, which help alleviate the pain.  (AR 49.)  Plaintiff also participates in pain management therapy and uses a TENS unit, which helps with the inflammation.  (AR 49.)  Plaintiff also testified he was undergoing surgery on his neck one week after testifying at the hearing in October 2015.  (AR 50–51.)  Plaintiff testified that the neck surgery took over two years to schedule because Plaintiff does not have medical insurance.  (AR 59.)

With regard to his back pain, Plaintiff testified that it started when he fell at work in 2004.  (AR 51.)  Plaintiff stated that he feels like there is "a knife or something stuck in the middle of my back all the time" and the pain radiates around his ribs to his sternum/chest area.  (AR 52.)  The pain also radiates down his legs such that he experiences numbness and a burning sensation in his legs, especially in his thighs, which is worse in his left leg.  (AR 61.)  However, Plaintiff also testified the burning sensation has "been temporarily stuck to my shoulders and arms, but not my legs" and "it's just been numbness and sometimes shooting pain down my legs."  (AR 62.)  He experiences pain every day that fluctuates depending on what he is doing.  (AR 52.)  According to Plaintiff, standing and stooping make the pain worse, but he can alleviate the pain by "lean[ing] up against the wall with the flat of [his] back and lock[ing] [his] legs."  (AR 52–53.)  Plaintiff testified that, despite experiencing continuous pain for eleven years, he has not had any surgeries performed on his back and is not receiving any treatment for his back.  (AR 53.)  Plaintiff explained that he was waiting to complete the neck surgery before addressing his back and delayed the back surgery "until technology caught up" because he felt the back surgery was too invasive for the problems he was experiencing at the time.  (Id.)

Plaintiff testified that, as a result of his neck and back pain, he can sit for a couple hours before he needs to get up and move around for five to ten minutes.  (AR 54–55.)  He can stand for around a half hour without sitting before he needs to sit for ten to fifteen minutes.  (Id.)  He can walk a quarter mile at a time and lift five to ten pounds.  (AR 55.)  He does not experience any side effects from his medication, other than his blood pressure medication, which sometimes makes him drowsy.  (AR 57.)  Plaintiff testified that he was uncertain as to whether he could go

back to work at a job that involved mostly sitting, some standing or walking, and light lifting. (AR 59.)

On a typical day, Plaintiff wakes up and helps his wife get ready for work. (AR 56.) He is capable of independently handling his daily personal care including dressing, bathing, grooming, and toileting. (AR 57.) He takes care of the animals at his house, which include three dogs and a chicken, and helps with laundry and cooking. (AR 56.) When he cooks, he has trouble chopping and using a knife, but he can prepare quick and simple meals. (AR 61.) He does some cleaning, but no vacuuming, and he does not clean the dishes because he has broken too many dishes due to his deteriorating fine motor skills. (AR 56.) Plaintiff testified that he does not go shopping and has not driven for the past few months because his doctors advised that he not drive until he gets surgery on his neck. (AR 47, 57.) When he leaves the house, Plaintiff generally goes to visit with his in-laws who live less than a half mile away. (AR 57.)

Plaintiff testified he is capable of using a computer including typing and manipulating the mouse, but does not have a computer because he cannot afford one. (AR 57–58, 60.) He has difficulty with writing and pushing buttons, and cannot raise his arms above his shoulders. (AR 60–61.) His legs give out on him a couple times a month, usually after getting up from sitting down for extended periods. (AR 62.) If he lays down flat, his arms and shoulders go completely numb, so the most comfortable position is lying down with his upper body and legs elevated. (AR 62–63.) According to Plaintiff, he sleeps four hours total each night, which is interrupted every hour for him to move, and takes a nap for up to an hour in the afternoon. (AR 63.)

At the September 26, 2019 hearing, Plaintiff testified he hasn't driven in years, but was still driving occasionally in 2013 for short trips, such as driving to the grocery store. (AR 1014–15.) He testified that he did not have any difficulties or challenges at the grocery store at that time. (AR 1015.) He reported he had to change positions every 20 minutes due to pain. (AR 1016.) Plaintiff reported he was taking pain medications (Norco), diabetes medications, and high blood pressure medications, but that he no longer takes pain medications due to negative side effects related to his liver. (AR 1017.) He also reported his neck pain went down his shoulders to his hands. (Id.) Plaintiff testified he could only use his hands for five minutes, then would need

1  to massage them for approximately five to ten minutes because they went completely numb, "It

2  feels like I'm wearing mitts." (AR 1017–18.)  Plaintiff testified that he dropped things, and was

3  not able to carry a gallon of milk. (AR 1018.)

4         2.     Lay Witness Testimony (Plaintiff's Spouse)

5       On or around October 15, 2015, Plaintiff's wife, Lisa McMillen, submitted a third-party

6  statement noting Plaintiff's difficulties and pain. (AR 226–27.)  She claimed Plaintiff had

7  constant pain since he injured his back in October 2004. (AR 226.)  She reported a decrease in

8  Plaintiff's activities, like camping, riding their four-wheeler, or walking the dogs, or sitting in the

9  car for prolonged periods of time, stating "[h]is quality of life is pretty much non-existent." (Id.)

10  She also reported Plaintiff could not go grocery shopping because he could not walk very long.

11  (Id.)  Mrs. McMillen reported that, since his bilateral thyroidectomy in November 2010, Plaintiff

12  had "neck pain that radiate[d] through his jaw down to his shoulders all the way to his hands and

13  fingers," and resulted in lost dexterity and feeling in his hands. (Id.)  She reported Plaintiff

14  underwent chiropractic treatment and epidural injections without relief. (Id.)  She reported

15  Plaintiff's neurologist, Dr. Joshi, advised him he had "old bones" in his back and three discs in

16  his neck pushing on his spinal cord. (Id.)  She also reported Plaintiff waited nine months to see a

17  neurosurgeon at UC Davis, and he was currently awaiting surgery. (Id.)

18         3.     Vocational Expert Testimony, Cheryl Chandler

19       The VE testified that her testimony was consistent with the Dictionary of Occupational

20  Titles ("DOT") and its companion publications. (AR 1020.)  She testified that Plaintiff's prior

21  work, based on his testimony, could be characterized as "tractor trailer truck driver," (DOT

22  904.383-010, semi-skilled, specific vocational preparation ("SVP") level 4, medium exertion per

23  the DOT, heavy as performed), "chauffer" (DOT 359.683-010, SVP level 3, semi-skilled, light

24  exertion), and "personal attendant" (DOT 309.674-014, SVP level 3, light exertion). (AR 1020–

25  21.)  The VE determined that a hypothetical person with Plaintiff's age, education, work

26  experience, and the ability to lift/carry 10 pounds occasionally, less than 10 pounds frequently;

27  stand/walk two hours in an eight-hour day; sit for at least six hours in an eight-hour day; never

28  climb ladders/scaffolds; occasionally climb ramps/stairs; occasionally balance, stoop, crouch,

crawl, or kneel; occasionally reach overhead bilaterally; frequently reach in directions other than overhead; frequently handle and finger bilaterally; never work at unprotected heights or around dangerous machinery; occasionally operate foot controls bilaterally; and occasionally walk on uneven terrain—could not perform Plaintiff's past work.  However, the VE testified that other jobs did exist in the national economy that the aforementioned hypothetical person could perform, such as ticket counter worker, table worker, and lens inserter.  (AR 1022–23.)  Finally, as to the optional differences between bilateral and single extremity limitations, reaching overhead versus shoulder height, and other variations of reaching, as well as time off-task, the VE testified that her testimony was not based on the DOT, but on her years of training, education, and experience.  (AR 1024–25.)

### D.      The ALJ Findings of Fact and Conclusions of Law

The ALJ conducted the five-step disability analysis and made the following findings of fact and conclusions of law as of the date of the decision, January 2, 2020 (AR 975–84):

At step one, the ALJ determined Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2014,[6] and Plaintiff has not engaged in substantial gainful activity from June 1, 2011, the alleged onset date, through his date last insured (March 31, 2014). (AR 976 (citing 20 C.F.R. §§ 404.1571 et seq.).)

At step two, the ALJ determined Plaintiff has the following severe impairments through the date last insured: degenerative disc disease and osteoporosis.  (Id. (citing 20 C.F.R. § 404.1520(c)).)  The ALJ also noted Plaintiff had non-severe impairments of thyroid cancer (for less than 12 months), hypertension, obesity, and kidney stones.  These impairments were deemed non-severe because the ALJ found no evidence in the medical records of functional limitations resulting from these conditions, Plaintiff has not required any significant treatment for these conditions, and there is no evidence that these conditions have more than a minimal effect on Plaintiff's ability to work.  (Id.)  Nonetheless, the ALJ took Plaintiff's non-severe impairments

---

[6] A claimant must establish disability on or before the last date of disability insurance coverage in order to be entitled to a period of disability and disability insurance benefits.  Here, the ALJ determined from Plaintiff's earnings records that he acquired sufficient quarters of coverage to remain insured through March 31, 2014; Plaintiff does not dispute that this is the "date last insured."

into consideration as well.  (Id.)

At step three, the ALJ determined Plaintiff did not, through the date last insured, have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id. (citing 20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526).)

Before proceeding to step four, the ALJ determined Plaintiff has the RFC to perform:

> **sedentary work as defined in 20 CFR 404.1567(a) except lift and carry 10 pounds occasionally and less than 10 pounds frequently, stand and walk 2 hours of an 8-hour day and sit for 6 hours in an 8-hour day.  He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl.  He cannot climb ladders or scaffolds.  He can occasionally reach overhead with the bilateral upper extremities.  He can frequently reach other than overhead, and handle and finger with the bilateral upper extremities.  He can never work at unprotected heights or dangerous machinery. He can only occasionally walk on uneven terrain.  He can occasionally operate foot controls with the bilateral lower extremities.**[7]

(AR 976–82 (citing 20 C.F.R. §§ 404.1529; 404.1527; SSR 16-3p, available at 2016 WL 1119029 (Mar. 16, 2016) (emphasis in original).)

At step four, the ALJ found Plaintiff was unable to perform any past relevant work.  (AR 983 (citing 20 C.F.R. § 404.1565).)

At step five, the ALJ noted Plaintiff was born on March 22, 1972, and was 42 years old (which is defined as a younger individual age 18–44) on the date last insured, Plaintiff has at least a high school education and is able to communicate in English; and transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferrable job skills.  (Id. (citing 20 C.F.R. §§ 404.1563; 404.1564; SSR 82-41, available at 1982 WL 31389 (Jan. 1, 1982); 20 C.F.R. Part 404, Subpart P, Appendix 2).)  Considering

---

[7] The Court notes this RFC is markedly similar to the RFC determination reached by Judge Misenti during the original social security case.  (See AR 29.)  However, the instant RFC includes additional limitations, such as reducing the lift/carry restriction from 20 pounds occasionally to 10 pounds occasionally; reducing the prior restriction of occasionally working around moving mechanical parts to never doing so; and adding new restrictions limiting Plaintiff to occasional overhead reaching, frequent reaching in other directions, and frequent handling/fingering.

Plaintiff's age, education, work experience, and RFC, the ALJ determined there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed through the date last insured, such as:

- Ticket Counter Worker (DOT 219.587-010), a sedentary work position with an SVP level of 2, and approximately 50,000 jobs available in the national economy;

- Table Worker (DOT 739.687-182), a sedentary work position with an SVP level of 2, and approximately 2,000 jobs available in the national economy; and

- Lens Inserter (DOT 713.687-026), a sedentary work position with an SVP level of 2, and approximately 50,000 jobs available in the national economy.

(AR 983–84 (citing 20 C.F.R. §§ 404.1569; 404.1569(a); 20 C.F.R. Part 404, Subpart P, Appendix 2; SSR 83-11, available at 1983 WL 31252 (Jan. 1, 1983); SSR 83-12, available at 1983 WL 31253 (Jan. 1, 1983); SSR 83-14, available at 1983 WL 31254 (Jan. 1, 1983); SSR 85-15, available at 1985 WL 56857 (Jan. 1, 1985)).)  To determine the extent to which Plaintiff's limitations erode the unskilled sedentary occupational base, through the date last insured, the ALJ asked the VE whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.  (AR 983–84.)  With respect to the identified jobs, the ALJ noted the VE's testimony was consistent with the DOT and otherwise properly based on the VE's experience and expertise.  (AR 984.)

Therefore, the ALJ found Plaintiff has not been under a disability, as defined in the Social Security Act, at any time from June 1, 2011 (the alleged onset date), through March 31, 2014 (the date last insured).  (Id. (citing 20 C.F.R. § 404.1520(g)).)

## III.

## LEGAL STANDARD

### A.    The Disability Standard

To qualify for disability insurance benefits under the Social Security Act, a claimant must show he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[8] which can be expected to result in death or which

---

[8] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520;[9] Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006). The burden of proof is on the claimant at steps one through four. Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020). A claimant establishes a *prima facie* case of qualifying disability once he has carried the burden of proof from step one through step four.

Before making the step four determination, the ALJ first must determine the claimant's RFC. 20 C.F.R. § 416.920(e); Nowden v. Berryhill, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his]

---

that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3).

[9] The regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., and the regulations which apply to SSI benefits, 20 C.F.R. §§ 416.901 et seq., are generally the same for both types of benefits. Accordingly, while Plaintiff seeks only Social Security benefits under Title II in this case, to the extent cases cited herein may reference one or both sets of regulations, the Court notes these cases and regulations are applicable to the instant matter.

limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).   The RFC must consider all of the claimant's impairments, including those that are not severe.   20 C.F.R. §§ 416.920(e); 416.945(a)(2); Social Security Ruling ("SSR") 96-8p, underline available at 1996 WL 374184 (Jul. 2, 1996).[10]  A determination of RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.   See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion); 404.1546(c) (identifying the ALJ as responsible for determining RFC).  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."   Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001).

At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform given his RFC, age, education, and work experience.  20 C.F.R. § 416.912(g); Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006).  To do this, the ALJ can use either the Medical Vocational Guidelines ("grids"), or rely upon the testimony of a VE.  See 20 C.F.R. § 404 Subpt. P, App. 2; Lounsbury, 468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  "Throughout the five-step evaluation, the ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.' "  Ford, 950 F.3d at 1149 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

### B.    Standard of Review

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In determining whether to reverse an ALJ's decision, the Court reviews only those issues raised by the party challenging the decision.  See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  Further, the Court's review of the Commissioner's decision is a limited one; the Court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  42 U.S.C. §

---

[10] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner.  20 C.F.R. § 402.35(b)(1).  While SSRs do not have the force of law, the Court gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989); see also Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart (Thomas), 278 F.3d 947, 954 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)); see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).  "[T]he threshold for such evidentiary sufficiency is not high." Biestek, 139 S. Ct. at 1154.  Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard." Thomas v. CalPortland Co. (CalPortland), 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless. Stout, 454 F.3d at 1055–56.  Moreover, the burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). Nor may the Court affirm the ALJ on a ground upon which she did not rely; rather, the Court may review only the reasons stated by the ALJ in her decision. Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).  Nonetheless, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Ford, 950 F.3d at 1154 (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

## IV.

## DISCUSSION

Plaintiff raises five issues on appeal, which the Court characterizes as follows: (1) whether the ALJ provided specific, clear, and convincing reasons for discounting Plaintiff's pain

allegations; (2) whether the ALJ provided specific and legitimate reasons for discounting the medical opinions of (a) treating physicians Pam Rico and Kathleen Baron, and (b) examining/consulting physician Rustom Damania; (3) whether the ALJ provided germane reasons for discounting the lay witness statement; and (4) whether the ALJ resolved any apparent inconsistencies between the VE's testimony and the DOT.  (ECF No. 15 at 11–27.)

### A.    Evaluation of Plaintiff's Pain Allegations

Plaintiff argues the ALJ failed to identify specific, clear, and convincing reasons for discounting Plaintiff's allegations of pain and physical dysfunction.  (Id. at 11–18.)

### 1.    Legal Standard[11]

The ALJ is responsible for determining credibility,[12] resolving conflicts in medical testimony, and resolving ambiguities.  Andrews, 53 F.3d at 1039.  A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); SSR 16-3p; see also Orn, 495 F.3d at 635 ("An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment.").

Rather, an ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014); Smolen, 80 F.3d at 1281; SSR 16-3p, at *3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  Garrison, 759 F.3d at 1014; Smolen, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear,

---

[11]   Although Defendant emphasizes disagreement with the "clear and convincing reasons" standard in order to preserve the issue for future appeals, Defendant acknowledges the clear and convincing reasons standard is part of this Circuit's law, and argues the ALJ's reasons suffice under any standard.  (ECF No. 24 at 12 n.6.)  The Court further notes that, subsequent to the filings in this case, the Ninth Circuit provided additional clarification regarding this issue in Smartt v. Kijakazi, in which the appellate court indicated that the specific, clear, and convincing reasons requirement must fit within the overall substantial evidence standard.  Smartt, 53 F.4th 489, 499 (9th Cir. 2022) (holding clear and convincing standard is the applicable standard for weighing credibility in the Ninth Circuit).

[12]   SSR 16-3p applies to disability applications heard by the agency on or after March 28, 2016.  Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities."  SSR 16-3p, at *1-2.

and convincing reasons for doing so." Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citations omitted).

> If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints. In this regard, questions of credibility and resolutions of conflicts in the testimony are functions solely of the Secretary.

Valentine v. Astrue, 574 F.3d 685, 693 (9th Cir. 2009) (quotation omitted); see also Lambert, 980 F.3d at 1277.

Subjective pain testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence." See Vertigan, 260 F.3d at 1049 ("The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it."); see also 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). Rather, where a claimant's symptom testimony is not fully substantiated by the objective medical record, the ALJ must provide an additional reason for discounting the testimony. See Burch, 400 F.3d at 680–81; see also Stobie v. Berryhill, 690 Fed. App'x 910, 911 (9th Cir. 2017) (finding ALJ gave two specific and legitimate clear and convincing reasons for rejecting symptom testimony: (1) insufficient objective medical evidence to establish disability during the insured period; and (2) symptom testimony conflicted with the objective medical evidence).

Nevertheless, the medical evidence "is still a relevant factor in determining the severity of [the] claimant's pain and its disabling effects." Burch, 400 F.3d at 680–81; Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). Indeed, Ninth Circuit caselaw has distinguished testimony that is "uncorroborated" by the medical evidence from testimony that is "contradicted" by the medical records, deeming the latter sufficient on its own to meet the clear and convincing standard. See Hairston v. Saul, 827 Fed. App'x 772, 773 (9th Cir. 2020) (quoting Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1160 (9th Cir.

2008) (affirming ALJ's determination claimant's testimony was "not entirely credible" based on contradictions with medical opinion)) ("[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); see also Woods v. Comm'r of Soc. Sec. (Woods I), No. 1:20-cv-01110-SAB, 2022 WL 1524772, at *10 n.4 (E.D. Cal. May 13, 2022) ("While a *lack* of objective medical evidence may not be the sole basis for rejection of symptom testimony, inconsistency with the medical evidence or medical opinions can be  sufficient." (emphasis in original)).

Additional factors an ALJ may consider include the location, duration, and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; conflicts between the claimant's testimony and the claimant's conduct—such as daily activities, work record, or an unexplained failure to pursue or follow treatment—as well as ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, internal contradictions in the claimant's statements and testimony, and other testimony by the claimant that appears less than candid.  See Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014); Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); Smolen, 80 F.3d at 1284.  Thus, the ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record.  SSR 16-3p, at *5.

Finally, so long as substantial evidence supports the ALJ's assessment of a claimant's subjective complaint, the Court "will not engage in second-guessing." Thomas, 278 F.3d at 959.

2.   Analysis

Here, the ALJ noted Plaintiff's original allegations of disability due to hypothyroidism, lumbar and thoracic spine impairment, herniated disc, and severe back pain; and compared Plaintiff's 2015 testimony with his testimony from the September 26, 2019 hearing.  (AR 977.) The ALJ noted Plaintiff originally testified he had not been driving (per advice from a

1   neurosurgeon, until he got his neck operated on) starting in January 2013; but later testified he

2   had not driven in years but was still driving occasionally in 2013.  The ALJ also noted Plaintiff

3   testified in 2015 that he had no control of his hands and arms; had difficulty stooping; could sit

4   comfortably; and could only stand for 30 minutes, walk half a mile, and lift five to ten pounds;

5   whereas the ALJ noted in 2019, Plaintiff testified that he had to change positions every 20

6   minutes due to pain; and he could use his hands for only five minutes.  (AR 977, 982.)

7        Upon review of the evidence on file, the ALJ concluded Plaintiff's severe impairments

8   included degenerative disc disease and osteoporosis; but Plaintiff's other reported impairments—

9   hypertension, obesity, kidney stones, and thyroid cancer (which lasted less than 12 months)—

10  were non-severe.  (AR 976.)  Plaintiff has not challenged this finding.[13]  The ALJ concluded

11  Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged

12  symptoms; however, the ALJ found Plaintiff's statements concerning the intensity, persistence

13  and limiting effects of his symptoms, "to the extent they are inconsistent with the [RFC

14  assessment], which does incorporate certain limitations that are well supported by the medical

15  evidence of record," are "not entirely consistent with the medical evidence and other evidence in

16  the record," and are "not credible."  (AR 977, 982.)  More specifically, the ALJ reached an

17  adverse credibility determination because she found Plaintiff's testimony was inconsistent with

18  (1) the objective medical evidence of record, (2) Plaintiff's activities of daily living ("ADLs"),

19  and (3) his ability to effectively manage his symptoms using conservative treatment methods

20  without hospitalization or surgery.  (AR 977–82.)  Plaintiff challenges these findings.

21        **a.    Allegations Inconsistent with the Objective Medical Evidence**

22        One reason the ALJ provided for discounting Plaintiff's subjective complaints is that

23  Plaintiff's testimony is inconsistent with and unsupported by the objective medical evidence.  The

24  ALJ noted that Plaintiff's MRI results revealed many "mild" findings in addition to the findings

25  of disc bulges and mild to moderate narrowing of lateral recesses, such as mild spinal cord

26  encroachment and mild degenerative disc disease.  (AR 978 (citing AR 888 (2005 MRI of

---

[13] See Lewis, 236 F.3d at 517 n.13;  Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003) (stating court "will not consider any claims that were not actually argued in appellant's opening brief" and will only "review … issues which are argued specifically and distinctly in a party's opening brief.").

thoracic spine, slight dorsal spinal cord displacement at T7-8 and intermittent mild spinal cord encroachment); AR 355, 505–07, 886–87 (Jul. 20, 2010 MRI of thoracic spine, mild degenerative disc disease, prominent posterior disc bulge at T8-T9 without spinal stenosis or neural impingement, and no acute or subacute compression fractures) AR 353, 885; (July 2010 MRI of lumbar spine, moderate central disc bulge at L4-L5 with minimal degenerative disc disease); AR 290, 880 (August 2011 MRI of thoracic spine was "normal"); AR 255, 877 (October 2011 MRI of thoracic spine revealed mild degenerative changes); AR 459–60 (Nov. 13, 2013 MRIs of cervical and thoracic spine revealed mild degenerative changes); AR 452–53 (Dec. 11, 2013 MRIs showed degenerative changes, mild impression on ventral surface of spinal cord, mild chronic anterior wedging)).)  The ALJ also noted Plaintiff had a total thyroidectomy in November 2010, after which his pathology was "benign."  (Id. (citing AR 290, 880).)

The ALJ also noted Plaintiff's "normal" examination results, such as when Plaintiff visited the emergency room on April 23, 2013 for complaints of neck and shoulder pain, but demonstrated no acute distress, normal range of motion, normal strength, no swelling or deformity, no focal neurological deficits, and Plaintiff was told to take Ibuprofen for pain.  (Id. (citing AR 437).)  In another example, the ALJ noted NP Rico examined Plaintiff on February 13, 2014, noting Plaintiff was "angry he was not getting the benefits he was entitled to get" because he was given a 20% disability from Worker's Compensation, and finding that, even though Plaintiff had cervical spine and upper shoulder area spasms, and weakness to upper extremity grips, Plaintiff also presented as well developed, in no acute distress, had a steady gait, changed positions with ease, and had normal full range of motion of all joints.  (AR 979 (citing AR 489).)  In yet another example, the ALJ noted NP Rico explained to Plaintiff during a March 2014 appointment that his MRI findings were not severe enough to warrant surgery, and Plaintiff was encouraged to participate in physical therapy.  (Id. (citing AR 672).)  The ALJ noted several of such examinations, in which "essentially normal" findings were revealed.  (AR 979–80 (citing, e.g., AR 478 (May 2014 "essentially normal" physical examination); AR 672 (NP Rico noted essentially normal physical examination); AR 468–70 (Apr. 30, 2014 examination revealed normal muscle strength and tone, sensation, and reflexes); AR 465–67 (August 2014 exam,

same); AR 463–64 (Oct. 1, 2014 exam, same); AR 472 (Jul. 28, 2014 nerve conduction studies showed normal median nerves and no evidence of compression neuropathy, polyneuropathy or ongoing cervical radiculopathy); AR 843–44 (Sept. 2014 MRI revealed no changes from Dec. 2013 MRI); AR 363 (Jun. 2010 normal physical exam)).)  The ALJ's reference to this medical evidence is sufficiently specific, and supports the ALJ's finding that Plaintiff's symptom testimony was inconsistent with the objective medical evidence.  See Smartt, 53 F.4th at 498 ("When objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony") (emphasis in original).

Furthermore, the ALJ noted Plaintiff's allegations were inconsistent with the medical opinion evidence.  As discussed in greater detail herein, the ALJ accorded great weight to Dr. Amusa's opinion, which included a limitation for standing/walking for two hours in an eight-hour day.  (AR 1003–04, 1007.)  This limitation is inconsistent with Plaintiff's testimony that he can only stand for 30 minutes.  (See AR 54–55.)  This also constitutes a clear and convincing reason for the ALJ to discount Plaintiff's pain allegations.  See Carmickle, 533 F.3d at 1160 (affirming ALJ's finding that claimant's testimony that he could only lift ten pounds occasionally was "not entirely credible" based on contradictions with medical opinions that he could lift ten pounds frequently and 20 pounds occasionally); see also Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008) (affirming the ALJ's rejection of claimant's subjective allegations in part because of the medical opinions and prior administrative findings); SSR 16-3p ("State agency medical and psychological consultants and other program physicians and psychologists may offer findings about the existence and severity of an individual's symptoms.  We will consider these findings in evaluating the intensity, persistence, and limiting effects of the individual's symptoms.").

In challenging the ALJ's findings, Plaintiff argues the diagnostic and examination evidence did not support Plaintiff's symptom allegations, that the ALJ's characterization of the medical records as including "mild" and "normal" findings was inaccurate, and he points to various records in support of his allegations of debilitating neck and back pain with radicular symptoms.  (ECF No. 15 at 15–17.)  For example, Plaintiff argues that imagining of Plaintiff's

cervical spine showed multiple cord impingements, which seemed to account for Plaintiff's pain. (AR 850); MRIs showed multilevel disc protrusions compressing or indenting the spinal cord (AR 844, 907); neurosurgical evidence of decreased sensation along cervical and lumbar nerve distributions (AR 731); upper extremity weakness (AR 617–18, 628, 645, 656, 662, 672–73, 679, 685, 692, 699, 705, 712, 738, 745, 751, 853, 860); a CT scan of the thoracic spine showed significant herniation, and a Myelogram showed impingement at T7-8 with ventral cord effacement (AR 352); and Dr. Smith noted Plaintiff had a new disc rupture at L4-5 in October 2011, with right L5 and S1 nerve root compression, and he observed diminished sensation in Plaintiff's L5 nerve distribution (AR 241–42).

However, "[e]ven assuming without deciding that the medical evidence could support conflicting inferences, the court must defer to the Commissioner where the evidence is susceptible to more than one rational interpretation." Quinones v. Astrue, No. CV 08-7225 AGR, 2009 WL 3122880, at *3 (C.D. Cal. Sept. 25, 2009) (citing Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995) ); see also Andrews, 53 F.3d at 1039 ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.").  Here, Plaintiff cites to much of the same evidence identified and discussed by the ALJ, but merely offers an alternative rational interpretation of the records.  As previously noted, this is not sufficient to establish reversible error and the Court "will not engage in second-guessing." Thomas, 278 F.3d at 959; Ford, 950 F.3d at 1154; Burch, 400 F.3d at 679; see also Davis v. Berryhill, 736 Fed. App'x 662, 665 (9th Cir. 2018) ("Though [the claimant] may disagree with the ALJ's interpretation of the record, the latter's interpretation is supported by substantial evidence, which precludes the Court from engaging in second-guessing.").

Importantly, the Court notes the ALJ's adverse credibility determination does not indicate a complete rejection of Plaintiff's pain allegations.  To the contrary, the ALJ carefully considered Plaintiff's allegations and the objective medical evidence supporting much of Plaintiff's pain testimony (see AR 977–82); this is reflected in the RFC determination, which limits Plaintiff to sedentary work only, plus several additional functional restrictions, such as lift/carry limitations, stand/walk limitations, sitting limitations, reaching limitations, and handling/fingering limitations.

(AR 976–77.)  Thus, in noting Plaintiff's testimony of debilitating symptoms was inconsistent with the record, the ALJ expressly noted her finding that Plaintiff's testimony was inconsistent with the record "to the extent [it is] inconsistent with the [limitations already included in the RFC assessment], which does incorporate certain limitations that are well supported by the medical evidence of record."  (AR 977, 982.)

Thus, the Court finds the ALJ's reference to the medical records to identify inconsistencies in Plaintiff's testimony constitutes a specific, clear, and convincing reason supported by substantial evidence in the record that supports the ALJ's adverse credibility determination.[14]  Lambert, 980 F.3d at 1277; Hairston, 827 Fed. App'x at 773; Carmickle, 533 F.3d at 1160; Woods I, 2022 WL 1524772, at *10 n.4.

**b.    Activities of Daily Living**

Another reason the ALJ provided for discounting Plaintiff's testimony was his ADLs.  As the ALJ noted, Plaintiff testified at the 2015 hearing that he read books and magazines regularly and could use a computer, which was at odds with his complaints of limited use of his hands. (AR 57–58, 60, 982.)  The ALJ also noted Plaintiff was able to run errands to the post office or grocery store without assistance, drove a car, and was able to do light housekeeping, take care of three dogs and a chicken, engage in personal care, do some cleaning, help cook, visit with family, and go fishing.  (AR 56–58, 191–92, 982.)  On this record, the ALJ concluded that Plaintiff's activities cut against his allegations of totally disabling symptoms.  (AR 982.)

Plaintiff takes issue with the ALJ's finding regarding his ADLs and argues the ALJ

---

[14] The Court notes Defendant additionally argues that, under the law of the case doctrine, the district court's determination in Plaintiff's first appeal that the ALJ provided sufficient clear and convincing reasons for discounting Plaintiff's symptom testimony should similarly be upheld here.  (See ECF No. 18 at 11–12.)  The Ninth Circuit has applied the law of the case doctrine to the social security context.  See Stacy v. Colvin, 825 F.3d 563, 567 (9th Cir. 2016).  The court cautioned the doctrine should not be applied when the evidence on remand is substantially different, when the controlling law has changed, or when applying the doctrine would be unjust.  Id.  Here, Plaintiff originally appealed a decision set forth by a different ALJ than the one who authored the decision presently on appeal, the ALJs identified different severe impairments and limitations in Plaintiff's RFC determinations, and the second ALJ had additional medical evidence in the record to consider, as well as Plaintiff's testimony from the second administrative hearing, and new testimony from a medical expert.  Therefore, while the Court notes both decisions require application of the same legal standards, both decisions relied upon largely the same medical record, and there are striking similarities between the two decisions as to this issue, it declines to apply the law of the case doctrine to the instant issue.  In any event, the Court has concluded the current ALJ's decision sets forth clear and convincing reasons that are adequately supported by substantial evidence from the record to reach an adverse credibility determination against Plaintiff.

overstated his activities and failed to elaborate on how these activities contradicted his testimony. (ECF No. 15 at 17–18.)  For example, while Plaintiff reported he used a computer, he also testified that he did not own one.  (AR 58.)  Plaintiff also argues his wife reported he could not go grocery shopping because he could not walk very long, and he could not sit in the car for prolonged periods of time.  (AR 226.)  Thus, Plaintiff argues, the record indicates Plaintiff's activities were less expansive than the ALJ indicated.  However, the Court finds the ALJ sufficiently identified "which daily activities conflicted with which part of Claimant's testimony." Burrell v. Colvin, 775 F.3d 1133, 1138 (9th Cir. 2014) (emphasis removed).  Specifically, the ALJ explained Plaintiff's claim that he had limited use of his hands conflicted with his ability to regularly read books and magazines and use a computer.  (AR 30.)  Plaintiff's testimony is inconsistent with his activities of daily living because if Plaintiff could not control his fingers and felt like he was wearing mitts, as he testified (AR 48, 60), he would not be able to regularly pick up and read books and magazines or push the buttons on a keyboard when using a computer. Accordingly, the ALJ properly found that Plaintiff's testimony of debilitating fine motor skills conflicted with his daily activities.  This finding constitutes a clear and convincing reason to support the ALJ's credibility determination.  Molina v. Astrue, 674 F.3d 1104, 1112–13 (9th Cir. 2012), superseded by regulation on other grounds; Valentine, 574 F.3d at 693.

Furthermore, Ninth Circuit caselaw demonstrates that ADLs may be grounds for discounting allegations that an impairment is so severe it is totally debilitating, even if such activities are not directly transferrable to a work setting.  See Molina, 674 F.3d at 1112–13 (noting "the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferrable to a work setting … Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.") (internal citations omitted); see also Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989) (affirming the ALJ's decision where the claimant's allegations were inconsistent with activities of personal care, shopping, chores, riding public transportation, and driving); Burch, 400 F.3d at 680 (finding the ALJ properly discounted the claimant's allegations where the

claimant's activities suggest higher functionality, including caring for personal needs, cooking, cleaning, shopping, and interacting with family).  As the Ninth Circuit has explained, "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  Molina, 674 F.3d at 1113; Valentine, 574 F.3d at 694 (while daily activities "did not suggest [Plaintiff] could return to his old job [they] did suggest that [Plaintiff's] later claims about the severity of his limitations were exaggerated").  Thus, even if Plaintiff's activities were not particularly extensive, the ALJ's conclusion that he was not as limited as he claimed was a reasonable and valid basis for discounting his allegations.

In Valentine v. Astrue, for example, the ALJ determined the claimant "demonstrated better abilities than he acknowledged in his written statements and testimony" and that his "non-work activities … are inconsistent with the degree of impairment he alleges."  Valentine, 574 F.3d at 693.  The ALJ further remarked on the claimant's ADLs, but acknowledged these activities did not suggest that the claimant could return to his old job.  Id.  Instead, the ALJ indicated she thought the ADLs suggested the claimant's later claims about the severity of his limitations were exaggerated.  Id.  The Ninth Circuit found the ALJ provided clear and convincing reasons to reject the claimant's subjective complaint testimony because she identified evidence that directly contradicted the claimant's claims that his PTSD was so severe that he was unable to work, including contentions about how debilitating his fatigue was.  Id.  Thus, as demonstrated, evidence of ADLs need not directly contradict or disprove a specific alleged limitation, but may cut against the ultimate claim of disability based on the allegation that impairments are "totally debilitating."  Here, the ALJ found the aforementioned ADLs constituted activities that were inconsistent with Plaintiff's allegations of total disability.  Importantly, the substantial evidence inquiry "defers to the presiding ALJ, who has seen the hearing up close."  Biestek, 139 S. Ct. at 1157. Here, the Court cannot say that the ALJ's interpretation of the available evidence was not rational, Shaibi v. Berryhill, 883 F.3d 1102, 1108 (9th Cir. 2017); therefore, it will not disturb the ALJ's findings.  See also Burch, 400 F.3d at 680–81 (the ALJ is the fact-finder, and is entitled to choose between competing interpretations of the record); Rollins,

261 F.3d at 857 (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all of the activities and noting that the ALJ's interpretation "may not be the only reasonable one").

### c.      Conservative Treatment/Lack of Treatment

Evidence that a claimant's medical treatment was relatively conservative may properly be considered in evaluating a claimant's subjective complaints.  See Tommasetti, 533 F.3d at 1039–40; Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted).  The ALJ noted that Plaintiff "has never undergone surgery or hospitalization and has managed conservatively with scant evidence of medical treatment during the last several years."[15] (AR 982.)  Providing other examples, the ALJ noted that, in January 2011, Plaintiff reported his pain was "fairly well controlled" with medication (AR 980 (citing AR 307)); when Plaintiff went to the emergency room in April 2013 complaining of neck and shoulder pain, he was only treated with Ibuprofen (AR 978 (citing AR 429, 437)); and when Plaintiff was examined by NP Rico in March 2014, she explained to him that his MRI findings were not severe enough to warrant surgery, but she encouraged him to participate in physical therapy (AR 979 (citing AR 642)).

"The ALJ is permitted to consider lack of treatment in his credibility determination." Burch, 400 F.3d at 681.  Further, "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."  Warre v.

---

[15] The Court notes the ALJ additionally found that, following Plaintiff's 2003 injury from which his instant allegations of disability arise, Plaintiff "was able to work successfully for a number of years after [the] accident." (AR 982.)  Plaintiff argues it was error for the ALJ to consider his ability to work prior to the alleged onset date of June 1, 2011, as that time falls outside the relevant disability period.  The Court agrees (and Defendant appears to concede this point).  (See ECF No. 18 at 14 n.5); see also Dotson v. Astrue, No. 1:10-cv-00243 SKO, 2011 WL 1883468, at *6 (E.D. Cal. May 17, 2011) (medical opinion rendered a year outside of the relevant disability period deemed "stale and not time-relevant to [the claimant's] current claim of disability.").  However, the Court finds such error is harmless, because the ALJ cited to multiple other records occurring during the relevant disability period which support her finding of conservative treatment.  The Court further notes that, even if the ALJ's reference to Plaintiff's pre-onset date renders her entire finding of conservative treatment to be in error, the ALJ nonetheless identified other clear and convincing reasons—i.e., that Plaintiff's allegations were inconsistent with the medical record and with his ADLs—to support her adverse credibility determination, which were "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds."  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); see also Wells v. Comm'r Soc. Sec., No. 1:17-cv-00078-SKO, 2017 WL 3620054, at *10 (E.D. Cal. Aug. 23, 2017) ("While the ALJ erred in providing one invalid reason for the credibility finding ... that error was harmless, as substantial evidence still supports the ALJ's credibility determination notwithstanding the single errant rationale.").

1   Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006); see also Tommasetti, 533

2   F.3d at 1040 (favorable response to conservative treatment undermined claimant's testimony of

3   subjective complaints).  Physical therapy, similarly, constitutes conservative treatment.  See id. at

4   1039–40 (claimant's treatment, including physical therapy, the use of anti-inflammatory

5   medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset, were

6   deemed "conservative").  Thus, the ALJ identified specific, substantial evidence in the medical

7   record in support of her finding that Plaintiff's treatment was overall conservative in nature,

8   constituting a clear and convincing reason to discount Plaintiff's pain allegations.  Tommasetti,

9   533 F.3d at 1039–40; Parra, 481 F.3d at 751.

10      Notably, Plaintiff does not dispute the ALJ's findings as to his lack of hospitalization and

11   medical records.  Rather, Plaintiff disputes the adverse credibility finding due to the lack of

12   surgery finding on two grounds.  First, Plaintiff argues that his doctor advised that he needed back

13   surgery, but the surgery was denied by his workers' compensation insurance.  (ECF No. 15 at 16

14   (citing AR 293, 304, 352).)  This argument is unavailing.  Generally, a claimant's inability to pay

15   for treatment cannot support an adverse credibility finding.  Trevizo v. Berryhill, 871 F.3d 664,

16   681 (9th Cir. 2017).  However, the Ninth Circuit has also held that an "unexplained, or

17   inadequately explained, failure to seek treatment … can cast doubt on the sincerity of the

18   claimant's [subjective symptom] testimony."  Fair, 885 F.2d at 603.  Similarly, where the ALJ

19   determines the claimant's proffered reason for failing to seek treatment is not believable, this, too,

20   can cast doubt on the sincerity of the claimant's pain testimony.  Molina, 674 F.3d at 1114.  Here,

21   the record indicates multiple credibility problems with both of Plaintiff's allegations—that he was

22   referred for surgery, and that he did not undergo that surgery because it was denied by his

23   worker's compensation insurance.  Notably, Plaintiff does not indicate when the at-issue surgery

24   referral was made; but the records indicate one referral was made sometime prior to August 2010

25   (see AR 352), or alternatively, a referral was made in August 2015 by Plaintiff's new doctor (AR

26   918–21).  As previously noted, however, the ALJ need not consider stale medical records that

27   predate the alleged date of onset of disability (here, June 1, 2011), or records that post-date the

28   relevant disability period (here, March 31, 2014).  See Dotson, 2011 WL 1883468, at *6; see also

Thomas v. Berryhill, No. 1:16-cv-01337-JLT, 2018 WL 534012, at *5–6 (E.D. Cal. Jan. 24, 2018) (rejecting claimant's argument that an ALJ may not simply ignore medical records because they pre-date the onset date of disability or post-date the last insured date, and finding ALJ did not err in failing to address treating physician's opinion which predated date of onset for instant matter).  The Court notes the surgery appears to have also been endorsed by Dr. Stacey in August 2010, in a note in which Dr. Stacey indicated she believed Plaintiff would need surgery, even though his current MRI did not indicate such.  (AR 352.)  However, the ALJ accorded Dr. Stacey's opinion "no significant weight" because it was inconsistent with the "rather mild objective findings noted in [her] progress notes" and the medical record (AR 980)—a finding that Plaintiff does not challenge in the instant appeal (and has therefore waived), Lewis, 236 F.3d at 517 n.13; Indep. Towers of Wash., 350 F.3d at 929.  Indeed, the ALJ notes that on March 4, 2014, Plaintiff was informed his MRI findings were not severe enough to warrant surgery.  (AR 979 (citing AR 642).)  As previously noted by the Court, it is within the ALJ's province to resolve conflicts and ambiguities in the record, and determine credibility.  Lingenfelter, 504 F.3d at 1042; Andrews, 53 F.3d at 1039.  On this record, the ALJ appropriately resolved the conflict as to whether surgery was warranted during the relevant disability period, and therefore adequately justified her rejection of Plaintiff's surgery allegations.

Second, Plaintiff disputes the ALJ's adverse credibility finding due to lack of surgery on the basis that he did, in fact, have surgery.  But Plaintiff's surgery was not performed until October 2015, well after the relevant disability period.  Waters v. Gardner, 452 F.2d 855, 858 (9th Cir. 1971)) (a "long line of cases" has established that a claimant must establish disability by the date last insured, and that " 'any deterioration in [his] condition subsequent to that time is, of course, irrelevant.' ").  Furthermore, the Court notes the medical records of Plaintiff's October 2015 surgery characterize it as "elective," which is consistent with earlier records indicating Plaintiff was requesting surgery, even when it was not recommended.  (AR 914–18; see also AR 933–36.)  Accordingly, the Court finds this argument, too, is unavailing.

Finally, Plaintiff takes issue with the ALJ's characterization of his treatment as "conservative" where he was taking opioid pain medications (oxycodone and Norco), and

receiving some epidural steroid injections and trigger point injections, because Plaintiff contends this constitutes an "aggressive" form of treatment.  (ECF No. 15 at 15 (citing AR 676, 688, 694, 701).)  However, courts have reached varying conclusions based on the longitudinal records of each particular case as to whether a treatment plan, on whole, may be considered "conservative." Compare, e.g., Walter v. Astrue, No. EDCV 09-1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discredited claimant's allegations based on conservative treatment consisting of Vicodin, physical therapy, and an injection) with Revels v. Berryhill, 874 F.3d 648, 667 (9th Cir. 2017) ("doubting" that epidural steroid shots qualified as "conservative" medical treatment for fibromyalgia).  Here, the Court finds Plaintiff's treatment of narcotic medications, physical therapy, and some injections—where surgery was not recommend during the relevant disability period—was conservative within the context of the longitudinal record of this case.  See also Woods v. Kijakazi (Woods II), 32 F. 4th 785, 794 (9th Cir. 2022) (affirming ALJ's discounting of subjective testimony based on "very conservative" treatment of mostly medication alone and a knee injection); Zaldana v. Colvin, No. CV 13-7820 RNB, 2014 WL 4929023, at *2 (C.D. Cal. Oct. 1, 2014) (finding that evidence of treatment including Tramadol, ibuprofen, and "multiple steroid injections" was a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination); Martin v. Colvin, No. 1:15-cv-01678-SKO, 2017 WL 615196, at *10 (E.D. Cal. Feb. 14, 2017) ("[T]he fact that Plaintiff has been prescribed narcotic medication or received injections does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment as a whole was conservative, particularly when undertaken in addition to other, less invasive treatment methods."); Traynor v. Colvin, No. 1:13-cv-1041-BAM, 2014 WL 4792593, at *9 (E.D. Cal. Sept. 24, 2014) (finding evidence that Plaintiff's symptoms were managed through "prescription medications and infrequent epidural and cortisone injections" was "conservative treatment" and was sufficient for the ALJ to discount the plaintiff's testimony regarding the severity of impairment); Morris v. Colvin, No. 13-6236, 2014 WL 2547599, at *4 (C.D. Cal. Jun. 3, 2014) (ALJ properly discounted credibility when plaintiff received conservative treatment consisting of physical therapy, use of TENS unit, chiropractic treatment, Vicodin, and Tylenol with Vicodin); Jones v. Comm'r of Soc.

Sec., No. 2:12-cv-01714-KJN, 2014 WL 228590, at *7–10 (E.D. Cal. Jan. 21, 2014) (ALJ properly found that plaintiff's conservative treatment, which included physical therapy, anti-inflammatory and narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy, diminished plaintiff's credibility).  Thus, the ALJ did not err by characterizing Plaintiff's treatment as conservative.

In sum, the ALJ sufficiently identified multiple clear and convincing reasons in support of her determination that Plaintiff's treatment is inconsistent with the severity of his alleged symptoms.  Burrell, 775 F.3d at 1136; S.S.R. 16-3p at *10.  While Plaintiff may seek to suggest an alternative interpretation of the evidence, this is not sufficient to establish reversible error.  See Ford, 950 F.3d at 1154; Burch, 400 F.3d at 679 (citations omitted).  Accordingly, the Court finds the ALJ provided clear and convincing reasons supported by substantial evidence for discounting Plaintiff's subjective symptom testimony.

**B.      Evaluation of the Medical Opinion Evidence**

1.      Legal Standard

When evaluating claims filed before March 27, 2017, as here, the ALJ must explain the weight he gives to all medical source opinions.  See 20 C.F.R. § 404.1527(c).  There are three types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant [but who review the claimant's file] (nonexamining [or reviewing] physicians)."  Holohan v. Massanari, 246 F.3d 1195, 1201–02 (9th Cir. 2001) (citations omitted).  Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a reviewing physician's opinion.  Id.  Indeed, the regulations provide that, "when a treating source's medical opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the record]," it must be given controlling weight.  20 C.F.R. § 404.1527(c)(2).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to

considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  If a treating or examining physician's opinion is uncontradicted, the ALJ may reject it only by offering "clear and convincing reasons that are supported by substantial evidence." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).  Conversely, "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id. (citing Lester v. Chater, 81 F.3d 821, 830–31 (9th Cir. 1995)).  Similarly, where a treating or examining doctor's opinion is contradicted by medical evidence, the ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence in the record.  See Andrews, 53 F.3d at 1041.  The ALJ can satisfy the "specific and legitimate" burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  Tommasetti, 533 F.3d at 1041 (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  While a treating professional's opinion generally is accorded superior weight, and the opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional, Lester, 81 F.3d at 831, a non-examining opinion may constitute substantial evidence if it is consistent with other independent evidence in the record, and the ALJ is to resolve the conflict. See Thomas, 278 F.3d at 957; Orn, 495 F.3d at 632–33; Andrews, 53 F.3d at 1041.  Finally, "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings." Bray v. Comm'r Soc. Sec. Admin, 554 F.3d 1219, 1228 (9th Cir. 2009) (quotation and citation omitted); see also Thomas, 278 F.3d at 957; Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected).

2.   Analysis

Here, Plaintiff challenges the ALJ's evaluation of the medical opinions issued by NP Rico, Dr. Baron, and Dr. Damania.  (ECF No. 15 at 18–23.)

**a.      Treating Medical Providers NP Rico/Dr. Baron**

The ALJ noted that NP Rico completed a questionnaire dated September 14, 2014, which

appears to be signed by both NP Rico and Dr. Baron, in which NP Rico diagnosed Plaintiff with neck pain, thoracic pain, lumbar pain, herniated discs (cervical and lumbar), and nerve root and plexus disorder, and opined Plaintiff could sit and stand and/or walk for less than one hour in an eight-hour day; sit for 30 minutes at a time; occasionally lift ten pounds; has significant limitations reaching, handling, and fingering; would need several unscheduled breaks of 10–15 minutes; and would likely be absent more than three times per month due to his impairments. (AR 980 (citing AR 499, 502–03).)  The ALJ noted that NP Rico is not an acceptable medical source and her opinion, alone, cannot constitute documentation of severe or disabling vocational limitations; however, the ALJ nonetheless considered the report with respect to severity and effect on function.[16]  (AR 980.)  The ALJ discounted the opinion to the extent that there is no objective evidence of "herniated" discs, but only "small, mild bulges."  (AR 981.)  The ALJ further discounted the opinion on the basis that NP Rico's objective findings during physical examinations do not support her opinion.  (Id.)  Finally, the ALJ discounted NP Rico's opinion to the extent it conflicted with that of medical expert Dr. Amusa, to whom the ALJ accorded more weight.  (Id.)

Assuming NP Rico was Plaintiff's primary care provider, in conjunction with Dr. Baron, beginning in February 2014 (AR 613–21), the Court evaluates the jointly-signed questionnaire

---

[16] Plaintiff argues NP Rico and Dr. Baron co-signed the disability impairment questionnaire (AR 499–503, 70); therefore, the ALJ was required to accord greater weight to the opinion and explain the weight she gave to this opinion, and she failed to do so by finding that NP Rico was not an acceptable medical source.  (ECF No. 15 at 18–20.)  Plaintiff advanced a similar argument in his first appeal, which the district court declined to address in light of its finding that the ALJ's rejection of NP Rico/Dr. Baron's opinion was properly supported.  See McMillen I, 2018 WL 3769829, at *13 n.5.  As previously noted, this Court, having reviewed the medical records, expresses some skepticism that the questionnaire, which includes an illegible signature and an unknown date, should be accorded the same weight as that of a treating physician opinion under the Regulations, or that NP Rico was "acting as an agent" of Dr. Baron in the manner contemplated by the Ninth Circuit, Gomez v. Chater, 74 F.3d 967, 971 (9th Cir. 1996) (holding a nurse practitioner may qualify as an "acceptable medical source" by working "closely under the supervision" of a doctor to the extent that she is "acting as an agent" of the doctor).  Notably, in the treatment notes generated by NP Rico, Dr. Baron did not electronically sign off on the notes until weeks after Plaintiff's appointment; and in at least one instance, she did not sign off on the treatment note at all.  (See AR 658, 706, 693, 809.)  This record does not support a finding that NP Rico worked closely under the supervision of Dr. Baron.  See Randrup v. Berryhill, No. 1:16-cv-00436-SKO, 2017 WL 3334012, at *11 (E.D. Cal. Aug. 4, 2017) (finding that a nurse practitioner was not an acceptable medical source where the only evidence of the relationship between the nurse practitioner and doctor was the doctor's electronic signatures on treatment notes weeks and months after the claimant's appointments).  Regardless, even assuming the opinion was jointly authored with Dr. Baron, any error with respect to the ALJ's finding regarding NP Rico's status was harmless, because the ALJ still considered the opinion (AR 980), and supported her decision to discount the opinion for specific and legitimate reasons that are supported by substantial evidence in the record, as discussed herein.

1    pursuant to the Regulations in effect at the time.  As NP Rico's opinion is contradicted by the

2    opinions of Dr. Damania and Drs. Jackson and Mani, who concluded Plaintiff could walk and/or

3    stand for four hours a day and frequently lift and carry ten pounds, the ALJ was required to state

4    "specific and legitimate" reasons, supported by substantial evidence, for rejecting NP Rico's

5    opinion.  Trevizo, 871 F.3d at 675 (citing Ryan v. Comm'r Soc. Sec., 528 F.3d 1194, 1198 (9th

6    Cir. 2008)).  The inconsistency between NP Rico's objective findings and her opinion, standing

7    alone, is a sufficient specific and legitimate reason for discrediting NP Rico's

8    opinion.  See Connett, 340 F.3d at 875; see also Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th

9    Cir. 2001).

10        As previously noted, the ALJ found NP Rico's opinion was inconsistent with her

11    objective findings during her physical examinations and cited a specific example that NP Rico

12    opined Plaintiff suffered from "herniated discs," while the record only reflected "small, mild

13    bulges."  (AR 980.)  Plaintiff first appears to challenge the ALJ's decision by arguing that her

14    statement of "objective findings during physical examinations were not supporting of the treating

15    medical opinion" was boilerplate and conclusory without further elaborations or citations to

16    supporting record evidence.  (ECF No. 15 at 20–21.)  The first argument is plainly unavailing

17    based on a contextual reading of the ALJ's opinion, and her discussion in earlier pages of the

18    decision of NP Rico's findings and their relation to the objective medical record.  (See AR 978–

19    80); see also Molina, 674 F.3d at 1121 ("Even when an agency explains its decision with less than

20    ideal clarity, we must uphold it if the agency's path may reasonably be discerned."); see also

21    Magallanes, 881 F.2d at 755 (a reviewing court is "not deprived of [its] faculties for drawing

22    specific and legitimate inferences from the ALJ's opinion," provided "those inferences are there

23    to be drawn"); Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to

24    read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ

25    repeat substantially similar factual analyses at both steps three and five, we consider the ALJ's

26    treatment of the record evidence in support of both his conclusions at steps three and five."

27    (internal citation omitted)).

28        Next, Plaintiff appears to challenge the ALJ's interpretation of the record as supporting a

1    showing of "bulges" rather than "herniated discs."  As to this argument, while Plaintiff reaches a

2    different conclusion from the ALJ by looking to MRIs from August 2015 (AR 907), the MRIs

3    from December 2013 and September 2014 are consistent with the ALJ's decision.  Specifically,

4    as the ALJ pointed out, the December 2013 MRI of Plaintiff's cervical spine revealed

5    degenerative changes in the cervical spine; mild reversal of the normal cervical lordosis at C4–

6    C5; a two-millimeter left paracentral disc osteophyte complex at C4–C5, which mildly indented

7    the left ventral surface of the spinal cord; a two-millimeter central protrusion with associated

8    annular fissuring at the C5–C6 level, which caused a mild impression on the ventral surface of the

9    spinal cord; and a one millimeter central protrusion with associated annular fissuring, which

10   indented the thecal sac at the C6–C7 level. (AR 979–80 (citing AR 452–53).)  However, these

11   mild degenerative changes were unchanged since Plaintiff's MRI in September 2014.  (Id. (citing

12   AR 844).)  Further, as the ALJ pointed out, NP Rico herself explained to Plaintiff on March 4,

13   2014, just weeks before Plaintiff's date last insured (March 31, 2014), that his MRI findings were

14   not severe enough to warrant surgery.  (AR 979 (citing AR 642).)  NP Rico strongly encouraged

15   Plaintiff to participate in physical therapy, but Plaintiff refused because he said he could not

16   afford to travel to Oakhurst twice a week, despite NP Rico reminding him of a service that would

17   provide free transportation to his appointments.  (AR 642.)  Additionally, as the ALJ identified in

18   her decision, NP Rico's physical examinations of Plaintiff regularly found him to be in no acute

19   distress, able to change positions with ease, and have a steady gait and full range of motion in his

20   joints, with weakness to upper extremity grips.  (AR 979 (citing AR 617, 672–73).)  The Court

21   finds the aforementioned medical records cited by the ALJ sufficiently demonstrate the

22   contradictions between NP Rico's opinion and treatment notes, and therefore constitute a

23   "specific and legitimate" reason for rejecting NP Rico's opinion.  Plaintiff's attempts to establish

24   he contrary here appear to be a request for the Court to reweigh this medical evidence, which the

25   Court cannot do.  Tommasetti, 533 F.3d at 1038 (the court will uphold the ALJ's conclusion

26   where the evidence is susceptible to more than one rational interpretation).

27          Finally, Plaintiff argues the ALJ improperly accorded more weight to Dr. Amusa's expert

28   testimony, which contradicted NP Rico/Dr. Baron's opinion, because she only offered boilerplate

and conclusory assertions without explaining why she accorded more weight to Dr. Amusa's opinion. (ECF No. 15 at 21.) Further, Plaintiff argues this contrary medical source did not relieve the ALJ of her duty to provide specific and legitimate reasons for discounting NP Rico's opinion. (Id.) Again, the Court finds Plaintiff's argument reads the ALJ's decision and the record too narrowly and out of context, which does not constitute a basis for reversal. See Molina, 674 F.3d at 1121; Magallanes, 881 F.2d at 755; Rice, 384 F.3d at 370 n.5. The ALJ noted she accorded more weight to Dr. Amusa's opinion "as discussed below, as it is based on a thorough review of the record made by a qualified physician." (AR 980.) Later in her decision, the ALJ cites to and summarizes Dr. Amusa's expert testimony from the hearing, noting Dr. Amusa based his opinion on the consultative examination of Dr. Damania, EMG studies, and imaging studies reviewed in the record. (AR 981.) Furthermore, the ALJ's reliance on Dr. Amusa's opinion was proper here because she also identified other specific and legitimate reasons for discounting NP Rico's opinion (i.e., inconsistencies with the record) and Dr. Amusa's opinion was consistent with other independent evidence in the record. Thomas, 278 F.3d at 957; Orn, 495 F.3d at 632–33; Andrews, 53 F.3d at 1041. For these reasons, Plaintiff's arguments are unavailing and the Court finds the ALJ identified sufficient specific and legitimate reasons for discrediting NP Rico/Dr. Baron's opinion. See Lester, 81 F.3d at 830–31; Andrews, 53 F.3d at 1041; Thomas, 278 F.3d at 957; Bray, 554 F.3d at 1228; Meanel, 172 F.3d at 1114.

**b.      Examining/Consultant Physician Dr. Damania**

As previously noted, Dr. Damania examined Plaintiff on March 16, 2013, and reviewed his prior medical records. (AR 981 (citing AR 411–19).) Dr. Damania opined Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk four hours out of an eight-hour workday, and sit two to four hours out of an eight-hour workday. (Id. (citing AR 419).) Dr. Damania further opined that Plaintiff did not need an assistive device for ambulation even though Plaintiff subjectively stated he needed a cane because of left lower extremity weakness. (Id.) Dr. Damania limited Plaintiff to occasional bending, stooping, crouching, crawling, or kneeling, and no climbing or balancing. (Id.) Dr. Damania identified no manipulative impairments and no relevant visual or communicative impairments. (Id.)

The ALJ assigned "some weight" to Dr. Damania's assessment and opinion, on the basis that "it is generally consistent with the instant examination findings." (Id.) The ALJ found the overhead limitations were supported by further testing in the record, but the sitting limitations opined by Dr. Damania were not supported by the record. (Id.) Further, to the extent Dr. Damania's opinion conflicted with Dr. Amusa's opinion, the ALJ accorded greater weight to Dr. Amusa's opinion, which included review of medical evidence of record not available to Dr. Damania at the time of his examination. (Id.) As Dr. Damania's opinion is conflicts with the opinion of Dr. Amusa, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for discounting Dr. Damania's opinion. Trevizo, 871 F.3d at 675; Ryan, 528 F.3d at 1198.

Plaintiff takes issue with the ALJ's rejection of Dr. Damania's opinion with respect to the sitting limitation. He argues the ALJ failed to provide the required specific and legitimate reasons for discounting Dr. Damania's opinion: namely, Plaintiff argues the ALJ merely noted that Dr. Amusa's opinion conflicted with Dr. Damania's opinion, without sufficient explanation as to why she accorded more weight to Dr. Amusa's opinion than Dr. Damania's. (ECF No. 15 at 21–22.) Plaintiff further argues that, while the ALJ asserted that she was according more weight to Dr. Amusa's opinion, which was purportedly based on a review of information not available to Dr. Damania, the ALJ failed to identify what this "information" was or how it contradicted Dr. Damania's assessment of physical work restrictions. (Id. at 22–23.) The Court finds these arguments unavailing.

Here, the ALJ specifically elicited testimony from Dr. Amusa about his opinion with respect to Dr. Damania's sitting restriction. (AR 1006–07.) Dr. Amusa's opinion conflicted with Dr. Damania's. As the Court previously noted, a non-examining opinion may constitute substantial evidence for contradicting a treating physician's opinion if it is consistent with other independent evidence in the record. See Thomas, 278 F.3d at 957; Orn, 495 F.3d at 632–33; Andrews, 53 F.3d at 1041. The ALJ explained she accorded more weight to Dr. Amusa's opinion where it was more consistent with the record than Dr. Damania's. Furthermore, Dr. Damania's opinion was issued May 16, 2013; therefore, it is plain that Dr. Damania did not have the benefit

of considering the lack of degenerative changes shown between Plaintiff's 2013 and 2014 MRIs, or the other medical notes regarding treatment Plaintiff received after May 2013, that were considered by Dr. Amusa and discussed by the ALJ in her decision.

The Court also finds the ALJ identified substantial evidence from the record which supported Dr. Amusa's opinion and did not support Dr. Damania's opinion. Bray, 554 F.3d at 1228; Meanel, 172 F.3d at 1114. Dr. Amusa testified that a sitting limitation for two to four hours out of an eight-hour day was not warranted by the record. (AR 1006–07.) More specifically, Dr. Amusa noted Dr. Damania felt an assistive device was not necessary, and the finding of some weakness only supported a limitation of occasional foot control operating. (AR 1007.) Dr. Amusa also noted the records from 2013–2014 tended to reference greater complaints of neck pain, rather than back pain. (AR 1003.) This testimony supports the ALJ's finding that the sitting limitation opined by Dr. Damania was not supported by the record, and it was reasonably cited by the ALJ in her decision. See Magallanes, 881 F.2d at 755; Rice, 384 F.3d at 370 n.5. The ALJ also considered Plaintiff's 2015 testimony that he could sit comfortably (AR 977) the lack of changes shown between the December 2013 and September 2014 MRI results (AR 979–80), NP Rico's recommendation in February 2014 that that Plaintiff should pursue physical therapy and not surgery (AR 979), and the multiple findings of "mild encroachment," "mild degenerative disc disease," and normal strength and range of motion in the record (AR 978). This evidence is consistent with the ALJ's finding that Dr. Damania's opinion was not fully supported by the record.[17] Plaintiff's contrary argument, at most, constitutes an attempt to present an alternative interpretation of the evidence. However, as previously noted, this Court must defer to the decision of the ALJ where evidence exists to support more than one rational interpretation. Drouin v. Sullivan, 966 F.2d 1255, 1258 (9th Cir. 1992); see also Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999) (When the evidence presented could support either affirming or reversing the Commissioner's conclusions, the court cannot substitute its own judgment for that of the Commissioner). Accordingly, the Court finds the ALJ provided

---

[17] Again, although this evidence is discussed earlier in the ALJ's decision, the ALJ references these portions of her decision throughout the decision. See Magallanes, 881 F.2d at 755; Rice, 384 F.3d at 370 n.5.

1 sufficient specific and legitimate reasons to discount Dr. Damania's opinion.  See Andrews, 53

2 F.3d at 1041; Batson, 359 F.3d at 1195; Thomas, 278 F.3d at 957.

3       **C.      Evaluation of Lay Witness Statements**

4       Plaintiff argues the ALJ failed to provide germane reasons for discounting the lay witness

5 statements of his wife, Lisa McMillen.  (ECF No. 15 at 23–24.)

6       1.      Legal Standard

7       The Ninth Circuit has held that "[l]ay testimony as to a claimant's symptoms is competent

8 evidence that an ALJ must take into account, unless he or she expressly determines to disregard

9 such testimony and gives reasons germane to each witness for doing so."  Tobeler v. Colvin, 749

10 F.3d 830, 832 (9th Cir. 2014) (citations omitted); see also Molina, 674 F.3d at 1111.  In giving

11 "germane reasons" for disregarding a lay witness's testimony, the ALJ "generally should explain

12 the weight given to opinions from these sources or otherwise ensure that the discussion of the

13 evidence in the determination or decision allows a claimant or subsequent reviewer to follow the

14 adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  20

15 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2) (standard for evaluating opinion evidence for claims filed

16 before Mar. 27, 2017); see also Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (germane

17 reasons must be specific).

18       Nevertheless, even if the ALJ fails to provide germane reasons for rejecting lay witness

19 testimony, such error is harmless "when it is clear from the record that the ALJ's error was

20 inconsequential to the ultimate nondisability determination."  Tommasetti, 533 F.3d at 1038.

21 More specifically, the Ninth Circuit has held an ALJ's error in failing to explain his reasons for

22 disregarding lay testimony is harmless where the reasons for rejecting a claimant's symptom

23 testimony apply equally to third-party lay witness testimony.  Molina, 674 F.3d at 1115; see also

24 Valentine, 574 F.3d at 694 (ALJ's valid reasons for rejecting claimant's testimony were equally

25 germane to similar lay testimony); Lewis, 236 F.3d at 512 (stating that the ALJ "noted arguably

26 germane reasons for dismissing the [lay] testimony, even if he did not clearly link his

27 determination to those reasons"); Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993) (approving

28 ALJ's dismissal of daughters' lay testimony on the basis that they were merely repeating the

claimant's statements, where daughters' statements did not explain sufficiently when and to what extent they had the opportunity to observe their mother); cf. Stout, 454 F.3d at 1055–56 (explaining "where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.")  As the Court previously noted, Plaintiff bears the burden of showing that the error is not harmless.  Shinseki, 556 U.S. at 409.

2.     Analysis

Plaintiff argues the ALJ's discounting of Mrs. McMillen's statement was overly broad, lacked any specific analysis or reference to the record, and lacked germane reasons, and was therefore deficient.  (ECF No. 15 at 24.)  Further, Plaintiff argues the record evidence, including Plaintiff's "aggressive" course of treatment, supports Mrs. McMillen's claim that Plaintiff had a limited ability to sit, stand, and use his hands.  Therefore, Plaintiff argues the error was not harmless, as crediting Mrs. McMillen's statement would have supported a finding that Plaintiff lacked the hand dexterity to frequently handle and finger, as well as the sitting capacity to perform full-time sedentary work.  The Court disagrees.

The ALJ considered Mrs. McMillen's statement, noting a decrease in Plaintiff's activities and pain in his neck, hands, and fingers.  The ALJ accorded Mrs. McMillen's statement only slight weight, "if any," on the basis that the "evidence of record, taken as a whole, contradicts this statement."  (AR 982.)  Inconsistency with the medical evidence is a germane reason for rejecting lay witness testimony.  Bayliss, 427 F.3d at 1218.

Furthermore, applying the aforementioned authorities, the Court finds any error with respect to the ALJ's rejection of the lay testimony was harmless.  Mrs. McMillen's statement merely repeated the same statements of pain and limitations as alleged and testified to by Plaintiff.  As noted, the Ninth Circuit explains that "[w]here lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with our prior harmless error precedent to deem the ALJ's failure to discuss

the lay witness testimony to be prejudicial per se. Molina, 674 F.3d at 1117 (citing Valentine, 574 F.3d at 694; Lewis, 236 F.3d at 512). Plaintiff has not identified any portion of the lay testimony that was not already described by himself, nor does Plaintiff present any argument that the ALJ's reasons for rejecting his testimony are inapplicable to any portion of Mrs. McMillen's statement. Mrs. McMillen's reference to "aggressive treatment," in particular, was previously considered and properly rejected by the ALJ in her determination that Plaintiff's overall treatment was relatively conservative. As to other allegations raised by Mrs. McMillen, the Court notes the ALJ properly discounted Plaintiff's subjective testimony; thus, the same valid reasons for rejecting Plaintiff's testimony are equally applicable as germane reasons for rejecting Mrs. McMillen's lay testimony. Molina, 674 F.3d at 1115; Valentine, 574 F.3d at 694; Dodrill, 12 F.3d at 918. Plaintiff, therefore, has not met his burden to demonstrate any error that was not harmless. Shinseki, 556 U.S. at 409.

### D. Whether the ALJ Resolved Apparent Conflicts Between the Vocational Expert's Testimony and the DOT, Pursuant to SSR 00-4p

As previously noted, the ALJ reached an RFC determination that Plaintiff is capable of sedentary work, with additional functional restrictions. (AR 976–77.) The VE testified that Plaintiff was capable of performing jobs such as ticket counter worker, table worker, and lens inserter. (AR 984.)

Plaintiff argues apparent inconsistencies exist between the information listed in the DOT and the VE's testimony that Plaintiff could perform work as a ticket counter worker, table worker, and lens inserter. (ECF No. 15 at 25–27.) Specifically, Plaintiff asserts his RFC limitations to frequent handling and fingering, and occasional overhead reaching but frequent reaching in all other directions (AR 976–77), conflict with the DOT's description of the "ticket counter" job, which requires "constant reaching, handling, and fingering," and the "table worker" and "lens inserter" jobs, which require "frequent" reaching, handling, and fingering. (ECF No. 15 at 25.) Plaintiff argues the ALJ did not obtain an explanation for these deviations, nor did the VE offer one. (Id. at 26–27.) Therefore, Plaintiff argues remand for further development of the vocational evidence is necessary to resolve this apparent conflict. (Id. at 27.)

1    1.    Legal Standard

2        As previously noted, at step five, the Commissioner must "identify specific jobs existing

3    in substantial numbers in the national economy that [a] claimant can perform despite [his]

4    identified limitations." Zavalin v. Colvin, 778 F.3d 842, 845 (9th Cir. 2015) (citation and internal

5    quotations omitted).  That is, the ALJ must consider potential occupations the claimant may be

6    able to perform, based on the claimant's RFC, age, education and work experience, and the

7    information provided by the DOT and the VE.  See id. at 845, 846; Valentine, 574 F.3d at

8    689; 20 C.F.R. § 416.920(g).

9        "The DOT lists maximum requirements of occupations as generally performed, not the

10   range of requirements of a particular job as it is performed in specific settings."  SSR 00-4p,

11   available at 2000 WL 1898704 (Dec. 4, 2000).  "The term 'occupation,' as used in the DOT,

12   refers to the collective description of those jobs.   Each occupation represents numerous

13   jobs." Id.; see also Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995) (noting the DOT is not

14   comprehensive, that "[i]ntroduction of evidence of the characteristics of specific jobs available in

15   the local area through the testimony of a vocational expert is appropriate, even though the job

16   traits may vary from the way the job title is classified in the DOT," and holding "[T]he ALJ was

17   within  his  rights  to  rely  solely  on  the  vocational  expert's  testimony.")  (citations

18   omitted).  Information about a particular job's requirements may be available from a VE's

19   experience in job placement or career counseling.  SSR 00–4p.  Thus, a VE may be able to

20   provide more specific information about jobs or occupations than the DOT.  Id. see also Johnson,

21   60 F.3d at 1435; Lounsbury, 468 F.3d at 1114.  Accordingly, the ALJ may rely on VE testimony

22   regarding "(1) what jobs the claimant, given his or her [RFC], would be able to do; and (2) the

23   availability of such jobs in the national economy."  Tackett v. Apfel, 180 F.3d 1094, 1101 (9th

24   Cir. 1999); Lockwood v. Comm'r of Soc. Sec., 616 F.3d 1068, 1071 (9th Cir. 2010) (the ALJ can

25   meet  the  agency's  burden  of  proving  that  other  work  exists  in  significant  numbers  by  the

26   testimony of a VE).

27        Nonetheless, hypothetical questions posed to the VE must set out all the limitations and

28   restrictions of the particular claimant, as supported by the medical record.  Embrey v. Bowen, 849

50

F.2d 418, 422 (9th Cir. 1988).  Where the testimony of a VE is used, the VE must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational qualifications would satisfy.  20 C.F.R. § 404.1566(b); <u>see</u> <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 n. 3 (9th Cir. 1988).

SSR 00-4p provides that where there is an apparent unresolved conflict between VE evidence and the DOT, the ALJ is required to reconcile the inconsistency; that is, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE to support a determination or decision about whether the claimant is disabled.  SSR 00-4p, at *2; <u>see also</u> <u>Johnson</u>, 60 F.3d at 1435 (holding that, if the ALJ relies on a VE's testimony that contradicts the DOT, the record must contain "persuasive evidence to support the deviation.").   "An example of a conflict between the DOT and a VE's testimony is when the DOT's description of a job includes activities a claimant is precluded from doing, and the VE nonetheless testifies that the claimant would be able to perform that job."  <u>Martinez v. Colvin</u>, No. 1:14-cv-1070-SMS, 2015 WL 5231973, at *4 (E.D. Cal. Sept. 8, 2015) (citations omitted); <u>see also</u> <u>Zavalin</u>, 778 F.3d at 846 (providing example of apparent conflict as "expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle").  The ALJ must inquire, on the record at the disability hearing, as to whether or not there is such consistency. SSR 00-4p, at *2; <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1153–54 (9th Cir. 2007).  Further, the Social Security Administration ("SSA") notes neither the DOT nor the VE's evidence "automatically 'trumps' when there is a conflict"; rather, the ALJ must resolve the conflict by determining if the explanation given by the VE is reasonable and provides a basis for relying on the VE's testimony rather than the DOT information.  SSR 00-4p, at *2.

Where the ALJ fails to resolve an apparent inconsistency, the court is left with "a gap in the record that precludes [it] from determining whether the ALJ's decision is supported by substantial evidence."  <u>Zavalin</u>, 778 F.3d at 846; <u>Massachi</u>, 486 F.3d at 1154 ("we cannot determine whether the ALJ properly relied on [the VE's] testimony" due to unresolved occupational evidence).  However, a failure to ask the VE whether his or her testimony conflicts with the DOT may amount to harmless error if there is no conflict, or if the VE provides

"sufficient support for [his or] her conclusion so as to justify any potential conflicts." Massachi, 486 F.3d at 1154, n.19; see also Hann v. Colvin, No. 12-cv-06234, 2014 WL 1382063, at *15 (N.D. Cal. Mar. 28, 2014).

    2.    Analysis

The DOT provides the following descriptions for each of the jobs identified by the VE:

A ticket counter worker job (alternatively referred to in the DOT as "parimutuel-ticket checker")

> [c]ounts and records number of parimutuel tickets cashed at race track to verify records of cashiers.  Compares totals with entries on daily balance sheet.  Compares each ticket with sample or examines tickets under fluorescent light to verify validity of tickets.  Reports discrepancies."

Parimutuel-ticket Checker, DOT 219.587-010, available at 1991 WL 671989 (Jan. 1, 2016).  The DOT indicates reaching, handling, and fingering exist "constantly" (i.e., 2/3 or more of the time) in this job.  Id.

A table worker "[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles."  Table Worker, DOT 739.687-182, available at 1991 WL 680217 (Jan. 1, 2016).  The DOT indicates reaching, handling, and fingering exist "frequently" (i.e., 1/3 to 2/3 of the time) in this job.  Id.

A lens inserter "[f]its lenses into plastic sunglass frames and places frames on conveyor belt that passes under heat lamps which soften frames preparatory to setting of lenses."  Lens Inserter, DOT 713.687-026, available at 1991 WL 679273 (Jan. 1, 2016).  The DOT indicates reaching, handling, and fingering exist "frequently" in this job.  Id.

    **a.**    **Table Worker and Lens Inserter Jobs**

    (i)    Purported Conflict Regarding "Reaching" Limitations

As to Plaintiff's challenge based on the overhead reaching limitation, the Court notes the DOT does not address "overhead reaching," only "reaching" in general.  Plaintiff argues this apparent conflict required ALJ resolution.  Yet, the hearing transcript indicates the ALJ did resolve any apparent conflict.  Importantly, the VE was aware of the specific limitations in the RFC when she testified that a hypothetical person with Plaintiff's RFC could perform the

identified jobs.  At the hearing, the ALJ presented a hypothetical RFC that included limitations to occasional overhead reaching and frequent reaching in all other directions.  (AR 1022.)  The ALJ asked the VE to provide testimony that was consistent with the DOT and its companion publications, and to let the ALJ know if the VE deviated from the DOT and explain her reason/s for doing so.  (AR 1020.)  Based on the presented hypothetical, the VE testified that unskilled sedentary jobs that were available to the described hypothetical person included ticket counter worker, table worker, and lens inserter.  (AR 1022–23.)  The ALJ also asked the VE for the basis of her testimony about the "differences between bilateral and single extremity limitations as well as reaching being overhead[] versus shoulder height [or] some other variation of reaching."  (AR 1024.)  The VE affirmed her testimony as to these different limitations was based on her years of training, education, and experience, and access to professional resources that are generally relied upon by experts in her field.  (AR 1024–25.)  On this record, the ALJ reasonably relied upon the VE's expertise and testimony.  See Massachi, 486 F.3d at 1152.

Furthermore, the Court is unpersuaded that the purported conflict between "frequent reaching" versus "occasional overhead reaching, but frequent reaching in all other directions" as identified with respect to the table worker and lens inserter jobs constitutes an "apparent or obvious" conflict between the DOT and the VE's testimony.  Gutierrez v. Colvin, 844 F.3d 804, 807–08 (9th Cir. 2016).  To this point, the Court finds the  Ninth Circuit's decision in Gutierrez v. Colvin particularly instructive.  In Gutierrez, the ALJ found that the claimant was unable to lift her right arm above her shoulder, and the VE testified that a hypothetical person with that limitation could work as a cashier, a job requiring "frequent reaching" per the DOT.  Id. at 807. The Ninth Circuit found there was no "apparent conflict" between the claimant's RFC and the DOT's general statement that cashier occupations require "frequent reaching," because "overhead reaching is [not] such a common and obvious part of cashiering that the ALJ should have recognized a conflict and questioned the expert more closely before concluding [the claimant] could work as a cashier," see id. at 807–08:

> For a difference between an expert's testimony and the Dictionary's listings to be fairly characterized as a conflict, it must be obvious or apparent.  This means that the testimony must

1

2

3

4

5

be at odds with the Dictionary's listing of job requirements that are essential, integral, or expected.  This is not to say that ALJs are free to disregard the Dictionary's definitions or take them with a grain of salt—they aren't.  But tasks that aren't essential, integral, or expected parts of a job are less likely to qualify as apparent conflicts that the ALJ must ask about.  Likewise, where the job itself is a familiar one—like cashiering—less scrutiny by the ALJ is required.

6

7

8

9

10

11

12

13

Id. at 808.   The Ninth Circuit further explained that, while "reaching" generally connotes extending the hands and arms "in any direction," SSR 85-15, not every job that involves reaching requires the ability to reach overhead.  Gutierrez, 844 F.3d at 808.  The ALJ was therefore not obligated to follow up on a potential conflict that was "unlikely and unforeseeable," given how cashiering was typically performed, and the VE's testimony that the plaintiff could perform the job despite her limitations.  Id. at 808–09.  Accordingly, the court concluded the ALJ was entitled to rely on the VE's expertise to find that Plaintiff could perform other work, including the cashier job.  Id. at 809.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Following the Ninth Circuit's reasoning, many district courts within this circuit have similarly recognized that not every job that requires frequent or occasional "reaching" requires the ability to reach "overhead."  See, e.g., Michael v. Comm'r of Soc. Sec., No. 1:21-cv-00395-SAB, 2022 WL 3999819, at *20 (E.D. Cal. Sept. 1, 2022) (finding no apparent or obvious conflict between requiring occasional/frequent reaching per the DOT and RFC limitation for no overhead reaching, where final assembler, bonder operator, and ampoule sealer jobs did not appear to require overhead reaching); Guith v. Berryhill, No. 1:16-cv-00625-GSA, 2017 WL 4038105, at *5–6 (E.D. Cal. Sept. 13, 2017) (no obvious conflict between DOT's description of frequent/constant reaching and claimant's limitation of occasional overhead reaching where assembler, garment folder, and packager jobs "only require reaching in front of you"); Sanchez v. Colvin, No. EDCV 14-2204-JPR, 2016 WL 370687, at *16 (C.D. Cal. Jan. 29, 2016) (finding that "final assembler" tasks indicated in DOT would require only reaching forward and down, not overhead); Martinez, 2015 WL 5231973, at *4 (finding no conflict with DOT's frequent/constant reaching requirement existed because "[i]t is clear that the reaching required to perform [the paper patterns folder, nut sorter, and final assembler] occupations is not overhead, and is

consistent with Plaintiff's RFC [limiting overhead reaching]"); Moreno v. Berryhill, No. 1:16-cv-00121-GSA, 2017 WL 1881433, at *3-5 (E.D. Cal. May 9, 2017) (same, with respect to ampoule sealer, assembler, and nut sorter jobs).

Similarly, here, the Court concludes any "conflict" Plaintiff identifies is not "apparent or obvious" because the jobs identified by the VE do not foreseeably require frequent overhead reaching. Gutierrez, 844 F.3d at 809. Both the table worker and lens inserter jobs are defined as working with a conveyor belt. Common sense dictates that work on a conveyer belt would occur below shoulder height. Similarly, there is no reason to foresee that inserting lenses into glasses and placing them on a conveyor belt would require reaching overhead.

Plaintiff argues that "common experience does not suggest that the occupations of … table worker[] and lens inserter would require no more than occasional overhead reaching" (ECF No. 15 at 26), but he provides no further analysis, and he identifies no examples of "essential, integral, or expected" job tasks of a table worker or lens inserter which would include overhead reaching. Gutierrez, 844 F.3d at 807–08. Without more, Plaintiff's conclusory argument is unpersuasive.[18] Accordingly, the Court concludes the ALJ had no further duty to reconcile the purported reaching conflict, and any error was harmless. Gutierrez, 844 F.3d at 807–08.

(ii)     Purported Conflict Regarding Constant vs. Frequent Handling/Fingering

As to the purported conflict between the DOT requirements and the VE's testimony regarding the handling/fingering limitations, the Court finds no conflict exists with respect to the table worker and lens inserter jobs, because these jobs only require "frequent" handling/fingering, which is consistent with Plaintiff's RFC limitation of frequent handling/fingering. Accordingly,

---

[18] The Court additionally notes Plaintiff relies on Lamear v. Berryhill for the general proposition that a restriction to occasional overhead reaching, as here, conflicts with a claimant's ability to perform occupations that the DOT describes as requiring frequent reaching. (ECF No. 15 at 26 (citing Lamear, 865 F.3d 1201, 1203–05 (9th Cir. 2017)).) Such a broad and generalized assertion tends to misread Lamear, in which the Ninth Circuit reiterated that "the requirement for an ALJ to ask follow up questions is fact-dependent…." Lamear, 865 F.3d at 1205. Indeed, Lamear appears factually inapposite to the instant case. Notably, the identified jobs in Lamear were office helper, mail clerk, and parking lot cashier—none of which were identified as viable jobs for Plaintiff by the VE in the instant social security case, and Plaintiff makes no argument that the DOT duties and descriptions for those jobs are similar to the DOT descriptions for ticket counter worker, table worker, or lens inserter. Furthermore, the Lamear court's analysis heavily emphasized the discrepancy between the claimant's handling/fingering limitation, which is less relevant to this Court's consideration of Plaintiff's purported overhead reaching conflict. Thus, Plaintiff's reliance on Lamear is unavailing.

1  the Court does not see any conflict between the VE testimony and the DOT and concludes the

2  ALJ reasonably relied on the VE's testimony at step five with respect to the table worker and lens

3  inserter jobs.

### b.    Ticket Handler Job

5  As to Plaintiff's argument that a conflict exists between the DOT requirement of

6  "constant" reaching/handling/fingering for the ticket handler job, and Plaintiff's RFC limitation to

7  "frequent" handling/fingering and occasional overhead reaching/frequent other reaching, the

8  Court notes this appears to be an obvious discrepancy which the ALJ was required to address.

9  However, for the reasons previously noted, the Court finds the VE provided sufficient

10  testimony to address any conflict, and the ALJ properly relied upon the VE's testimony with

11  respect to the existence of the identified jobs.

12  Furthermore, having determined that no obvious conflict exists with respect to the other

13  two identified jobs, table worker and lens inserter, the ALJ's ultimate finding of nondisability was

14  supported by substantial evidence, and any error with respect to the ticket handler job is harmless.

15  See Stout, 454 F.3d at 1055–56; Molina, 674 F.3d at 1117; Lewis, 236 F.3d at 503.

### c.    Waiver of Challenge

17  Finally, the Court notes that Plaintiff's attorney had an opportunity to cross-examine the

18  VE at the hearing, and did not challenge the VE's credentials or her findings.  (See AR 1023–24.)

19  Notably, Plaintiff's attorney asked the VE whether changing the hypothetical to include a

20  restriction in which the person was limited to "less than occasional upper-extremity usage" would

21  affect the jobs; and the VE testified that such a restriction would eliminate all work.  (AR 1024.)

22  Thus, the VE distinguished between a person with limitations of occasional overhead reaching,

23  frequent reaching in all other directions, and frequent handling and fingering from a person with

24  less-than-occasional reaching/handling/fingering and confirmed that the identified DOT jobs were

25  available for the former but not the latter.  Following this testimony, Plaintiff did not examine the

26  VE as to any apparent conflict with the DOT as to such limitations.  Thus, the objection is

27  deemed waived.  Meanel, 172 F.3d at 1115 (holding that, "at least when claimants are represented

28  by counsel, they must raise all issues and evidence at their administrative hearings in order to

1   preserve them on appeal" and rejecting brand new challenge based on VE testimony)).

2        In sum, the Court finds the ALJ reasonably relied on the VE's testimony at step five to

3   find Plaintiff could perform other work.

**V.**

**CONCLUSION AND ORDER**

6        For the foregoing reasons, IT IS HEREBY ORDERED that:

7   1.    Plaintiff's motion for summary judgment appealing the decision of the

8       Commissioner of Social Security (ECF No. 15) is DENIED;

9   2.    Defendant's cross-motion in response to Plaintiff's brief (ECF No. 18) is

10      GRANTED; and

11  3.    The Clerk of the Court is DIRECTED to enter judgment in favor of Defendant

12      Commissioner of Social Security and against Plaintiff Fred McMillen and close

13      this case.

IT IS SO ORDERED.

Dated:  __May 12, 2023__

_____
UNITED STATES MAGISTRATE JUDGE